1 | ELLIS GEORGE LLP
  | Eric M. George (State Bar No. 166403)
2 |   egeorge@ellisgeorge.com
  | Serli Polatoglu (State Bar No. 311023)
3 |   spolatoglu@ellisgeorge.com
  | David D. Kim (State Bar No. 293445)
4 |   dkim@ellisgeorge.com
  | 2121 Avenue of the Stars, 30th Floor
5 | Los Angeles, California 90067
  | Telephone: (310) 274-7100
6 | Facsimile: (310) 275-5697

Electronically Filed
Superior Court of California
County of San Bernardino
Rancho Cucamonga District
7/18/2024 5:49 PM
By: Kayla Schuebel, DEPUTY

7 | Attorneys for Plaintiff Richard Montañez

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN BERNARDINO, RANCHO CUCAMONGA DISTRICT

RICHARD MONTAÑEZ, an individual,

            Plaintiff,

     vs.

PEPSICO, INC, a North Carolina Corporation;
FRITO-LAY, INC., a Delaware Corporation;
and DOES 1 through 30, inclusive,

          Defendants.

Case No.  CIVRS2400356

**COMPLAINT FOR:**
**(1) VIOLATION OF THE FAIR
EMPLOYMENT AND HOUSING ACT
(CAL. GOV'T CODE § 12900 *ET SEQ.*);
(2) FRAUD—MISREPRESENTATION
AND FALSE PROMISE;
(3) DEFAMATION AT COMMON LAW
AND PURSUANT TO CIV. CODE § 46;
(4) INTENTIONAL INTERFERENCE
WITH PROSPECTIVE ECONOMIC
ADVANTAGE;
(5) UNJUST ENRICHMENT;
(6) VIOLATION OF CALIFORNIA'S
UNFAIR COMPETITION LAW (CAL.
BUS. & PROF. CODE § 17200 *ET SEQ.*)**

**DEMAND FOR JURY TRIAL**

2402562.6

# INTRODUCTION

1.      Plaintiff Richard Montañez ("Plaintiff" or "Mr. Montañez") brings this lawsuit against Defendants PepsiCo, Inc. ("PepsiCo"), Frito-Lay, Inc. ("Frito-Lay"), and DOES 1-30 (collectively "Defendants") to bring an end to Defendants' smear campaign against him.

2.      Mr. Montañez is many things: the proud son of a Mexican immigrant, a high school dropout, a husband and father, a former janitor, the "Godfather of Latino Marketing," and the inventor of Flamin' Hot Cheetos—the product that launched Frito-Lay/PepsiCo's multi-billion dollar Flamin' Hot portfolio. But, above all, he is the embodiment of the American Dream.

3.      The subject of two best-selling books and a hit movie, Mr. Montañez's rags-to-riches success story is part of the cultural canon. The son of a Mexican immigrant, Mr. Montañez grew up in a poor migrant labor camp in Southern California, sharing a one-bedroom apartment with his parents and ten siblings. He struggled with reading and writing, as well as fitting in with his White classmates who, in the 1960s, were entirely unfamiliar with Mexican culture—not unlike the community at large.

4.      Mr. Montañez eventually dropped out of school and worked menial jobs before joining Frito-Lay as a janitor in its Rancho Cucamonga plant. Prompted by then-CEO Roger Enrico's directive that all employees "act like an owner," Mr. Montañez felt empowered and motivated to invent new snacks with flavor profiles that would appeal to Hispanic palates, which had been historically overlooked.

5.      The stars aligned when a machine used to produce Cheetos in the Rancho Cucamonga plant broke down, leaving a batch of unflavored Cheetos that had not been dusted with its normal cheese flavoring. Mr. Montañez took this batch home and, in his own kitchen, experimented by seasoning them with chili powder. He drew inspiration from elote—Mexican grilled corn seasoned with chili powder sold by local street vendors in his neighborhood.

6.      Mr. Montañez continued to develop this spicy Cheetos concept until he had a snack that he believed would be very popular among, and could be marketed directly to, the Latino community. Armed with nothing but a $3 tie, prototype and entrepreneurial spirit, he requested—and received—a meeting with none other than Frito-Lay/PepsiCo CEO himself, Roger Enrico.

1 Mr. Montañez pitched his product directly to Mr. Enrico and a group of Frito-Lay/PepsiCo's top

2 executives.

3       7.     They loved it.

4       8.     Frito-Lay/PepsiCo agreed to develop and market Mr. Montañez's product, and

5 while they attempted to cut Mr. Montañez out of parts of the process, they agreed with his strategy

6 to focus market the product to a Latino consumer base—still the largest consumer base for the

7 product.

8       9.     Needless to say, Flamin' Hot Cheetos were a hit. Few, if any, other snack products

9 have earned such a place in the cultural zeitgeist, spawning everything from songs to memes to

10 Halloween costumes to nail art.[1]





---

[1] Pictured, left: Pop Star Katy Perry dressed as a Hot Cheeto for Halloween. *See* Rebecca Macatee, *Katy Perry Is a Flamin' Hot Cheeto for Halloween—See the Pic!*, EONLINE.COM (Oct. 31, 2014), https://www.eonline.com/news/593727/katy-perry-is-a-flamin-hot-cheeto-for-halloween-see-the-pic. Pictured, top right: Frito-Lay Memes, *Hot Cheetos!*, FACEBOOK.COM (Dec. 16, 2017), https://www.facebook.com/fritolaymemes/posts/hot-

10.     Of course, at the heart of this success lies Mr. Montañez himself. Consumers are not just buying Flamin' Hot Cheetos—they are buying Mr. Montañez's inspirational story. To them, Flamin' Hot Cheetos are a testament to the fact that, in this country, success need not be begotten of Whiteness, or socioeconomic status, or a formal education—it can be a product of true grit and hard work. Or, at least, that's what Flamin' Hot Cheetos *used* to stand for, before Defendants began defaming and discrediting the janitor-turned-executive they long championed.

11.     Since Flamin' Hot Cheetos' inception, PepsiCo and Frito-Lay have been more than happy to leverage Mr. Montañez's story to drive the product's sales and popularity. For decades, Defendants recognized Mr. Montañez as the creator of Flamin' Hot Cheetos. Former CEOs of Frito-Lay Al Carey and Roger Enrico have expressly and publicly credited Mr. Montañez with the invention, and Defendants have, *inter alia*: (i) had Mr. Montañez give speeches across the country chronicling his invention of Flamin' Hot Cheetos (speeches that PepsiCo/Frito-Lay reviewed and approved) at large companies like Target and Walmart, and institutions like Harvard University and the University of Southern California, (ii) paid for his travel and lodging for his speaking tour, (iii) used his story to attract job candidates and inspire new employees, (iv) lauded his accomplishments in letters and notes from senior executives, and (v) promoted him up the ranks to Vice President of Multicultural Marketing & Sales at PepsiCo.

12.     After 42 years touting Mr. Montañez's story, Defendants made an inexplicable about-face in 2021, making false and misleading statements to the Los Angeles Times that led to the defamatory article: *The Man Who Didn't Invent Flamin' Hot Cheetos*. *See* Sam Dean, *The Man Who Didn't Invent Flamin' Hot Cheetos*, LATIMES.COM (May 16, 2021), https://www.latimes.com/business/story/2021-05-16/flamin-hot-cheetos-richard-montanez. Among other falsehoods, Frito-Lay told the outlet: "None of our records show that Richard was involved in any capacity in the Flamin' Hot test market." *Id.* It also stated: "[T]he facts do not support the urban legend."

---

cheetos/1323624154450786/; pictured, bottom right: SBG San Antonio, *San Antonio nail artist creating 'flamin hot' designs*, CBSAUSTIN.COM (Feb. 26, 2019), https://cbsaustin.com/news/local/san-antonio-nail-artist-creating-flaming-hot-designs.

13.    Relegating Mr. Montañez's life's work to an "urban legend" proved damaging beyond repair—both personally and professionally. Defendants' false statements concerning Mr. Montañez have made the public, and potential business partners, distrustful of him and his narrative. His livelihood, and mental health, have directly suffered as a result.

14.    The Los Angeles Times article was published approximately two years after Mr. Montañez retired from Frito-Lay/PepsiCo, when he was pursuing a full-time career as a motivational speaker and consultant. Mr. Montañez had easily been able to parlay his public speaking experience at Frito-Lay/PepsiCo into this second career, as Defendants had, for decades, pushed him into press tours focused on his invention of Flamin' Hot Cheetos. Prior to the article's publication, Mr. Montañez was working with multiple speaking bureaus, booking over 35 engagements per year at speaking fees ranging from $10,000 to $50,000. Since the article's publication, and Defendants' continued and relentless campaign to spread misinformation about him, Mr. Montañez has lost numerous partnerships, and seen a significant decrease in bookings, having booked just four speaking engagements this year.

15.    In addition to speaking and consultancy engagements, Defendants' lies have cost Mr. Montañez other major opportunities. While several prestigious production companies were interested in developing a documentary about Mr. Montañez's life, those discussions have all fizzled due to Defendants' disparaging remarks. Indeed, Oscar-winning production company Lightbox approached Mr. Montañez about a documentary project just a few months ago, but was forced to abandon the project after Defendants reiterated that they would not participate in any project that aimed at explaining Mr. Montañez did, in fact, invent Flamin' Hot Cheetos.

16.    For decades, Mr. Montañez lived the American Dream. Now, he's living the American Nightmare. After years of lauding Mr. Montañez to drive sales, Defendants' recent about-face—which can be only explained by some combination of a regime change, spite, and deep-seated racism—exemplifies the worst part of American history, exhibiting an attitude that says: Latinos with no higher education cannot be responsible for the success of a billion-dollar brand.

17.    Ultimately, Mr. Montañez said it best: "[Y]ou're going to love your company more

1  than they will ever love you." Ellise Shafer, *Disputed Flamin' Hot Cheetos Inventor Responds to*

2  *Frito-Lay's Claims: 'I Was Their Greatest Ambassador'*, Variety.com (May 16, 2021),

3  https://variety.com/2021/film/news/richard-montanez-flamin-hot-cheetos-responds-1234974227/.

4  Defendants have proved as much to be true, and Mr. Montañez now seeks redress through the

5  present action for violations of the Fair Employment and Housing Act (Cal. Gov't Code § 12900

6  *et seq.*) and Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*), as well as for

7  fraud, defamation, intentional interference with prospective economic advantage, and unjust

8  enrichment.

9  ## PARTIES

10  18.    Plaintiff Richard Montañez is a motivational speaker and a former senior marketing

11  executive for Defendants PepsiCo, Inc. and Frito-Lay, Inc.  He is a California citizen who resides

12  in Rancho Cucamonga, California.

13  19.    Defendant PepsiCo, Inc. ("PepsiCo") is an American multinational food, snack,

14  and beverage corporation.  PepsiCo is a North Carolina corporation with its principal place of

15  business in Purchase, New York, and is the parent company of Defendant Frito-Lay, Inc.

16  20.    Defendant Frito-Lay, Inc. ("Frito-Lay") is a Delaware corporation with its principal

17  place of business in Plano, Texas and is a wholly owned subsidiary of Defendant PepsiCo.  Frito-

18  Lay markets and sells Flamin' Hot Cheetos snacks.

19  21.    The true names, identities, or capacities, whether individual, corporate, associate, or

20  otherwise, of Defendants DOES 1 through 30, inclusive, are unknown to Plaintiff, who therefore

21  sues said Defendants by such fictitious names.  When the true names, identities, or capacities of

22  such fictitiously designated defendants are ascertained, Plaintiff will ask leave of this Court to

23  amend this Complaint to insert the said true names, identities, and capacities, together with the

24  proper charging allegations.

25  22.    Plaintiff is informed and believes and thereon alleges that each of the Defendants

26  sued herein as a DOE is responsible in some manner and liable herein for negligent, wanton,

27  reckless, and tortious conduct, and/or strict liability, and by such wrongful conduct, proximately

28  caused Plaintiff's injuries and damages.

23.   Plaintiff is informed and believes and thereon alleges that at all relevant times each of the Defendants was engaged with some or all of the other Defendants in a joint enterprise for profit, and bore such other relationships to some or all of the other Defendants so as to be liable for the conduct of them.  Plaintiff performed services for each and every one of the Defendants, and to the mutual benefit of all Defendants, and all Defendants shared control of Plaintiff, either directly or indirectly, and of the manner in which Defendants' business was conducted.

24.   At all times herein mentioned, Defendants (whether or not specifically identified or designated herein as a DOE Defendant), and each of them, were the agents, employees, servants, partners, independent contractors, joint venturers, and/or participants with all other Defendants, and with each other, and in doing the things hereinafter mentioned, were agents, employees, servants, partners, and joint venturers and/or acted with the consent and permission of the co-Defendants, and each of them.

**JURISDICTION AND VENUE**

25.   The Court has jurisdiction over the subject matter of this action pursuant to California Code of Civil Procedure Section 410.10.

26.   Venue in this Court is proper pursuant to California Code of Civil Procedure Section 395(a).

**FACTUAL ALLEGATIONS**

**I.    Mr. Montañez's Early Years, Mexican Heritage, and Entrepreneurial Spirit**

27.   Mr. Montañez comes from humble origins.  The son of a Mexican immigrant, Mr. Montañez grew up in a migrant labor camp in Southern California.  For much of this time, he shared a one-bedroom apartment with his parents and ten siblings.  Eventually, the family of twelve moved into an 800-square-foot home in the community.  As Mr. Montanez put it, the family was poor, but "it was a fun kind of poor."  *Hot Cheetos*, NPR.ORG (May 12, 2021), https://www.npr.org/transcripts/996228628.  Tight as quarters may have been, it fostered a tight-knit family unit.  Moreover, living in constant close proximity to other nearby migrant laborers, many of whom were also Mexican, ensured that Mr. Montañez grew up immersed in Mexican culture and forged a strong connection with it.

28.     Although it grounded his identity and sense of self, Mr. Montañez's Mexican heritage also presented him with adversity early on.  While attending grade school in the 1960s, Mr. Montañez had difficulty fitting in.  At that time, many of his classmates were entirely unfamiliar with Mexican culture and cuisine.

29.     One day, Mr. Montañez's mom packed him a burrito for his school lunch.  At lunch time, when Mr. Montañez pulled out the burrito from his bag, the other students—most of whom had never seen a burrito before—stared at him in confusion.  Mr. Montañez sheepishly hid the burrito away in his bag.

30.     Mr. Montañez begged his mom to pack him a bologna sandwich for lunch so that he would fit in with the other kids at school.  She refused, saying:  "[N]o, mijo, this is who you are."  *Id.*  Mr. Montañez took her words to heart, and this lesson in having pride in his heritage proved fundamental.

31.     The next day, Mr. Montañez's mom packed him *two* burritos—one for him to eat and the other for him to use to make a friend.  Rather than shying away from his Mexican heritage, Mr. Montañez embraced it.  Before long, the young Mr. Montañez tapped into a latent flair for entrepreneurship, and began selling his mom's burritos at school for $0.25 apiece.

32.     While Mr. Montañez made significant progress at school socially, he discovered other elements to be particularly challenging.  Throughout his early years, try as he might, Mr. Montañez struggled with reading and writing.  Eventually, Mr. Montañez dropped out and began working labor-intensive jobs to earn what money he could.  While he would later go on to earn his GED, by the time he was 18 years old, Mr. Montañez had already worked a series of low-wage jobs including slaughtering chickens, picking grapes, and washing cars.

## II.     Mr. Montañez Gets His Start at Frito-Lay as a Janitor.

33.     In 1976, while working at the car wash, Mr. Montañez learned from a friend that Frito-Lay was hiring at its Rancho Cucamonga plant.  Determined to do more with his life than work one menial job after another, Mr. Montañez set out to apply.  Given his struggles with reading and writing, filling out the application posed a considerable challenge to Mr. Montañez, so he enlisted the help of his future wife, Judy, to complete the task.

34.    To his elation, his application was accepted, and Frito-Lay hired him as a janitor. Mr. Montañez rushed to tell his grandfather the news, and he responded: "[W]hen you mop that floor, you make sure that it shines. And when people see it, they know that a Montañez mopped it."

35.    This is precisely the work ethic Mr. Montañez applied to this job, and every job he held thereafter.

36.    Mr. Montañez took initiative. Although he worked in sanitation, when anyone needed a break on the production line, he would volunteer to fill in. He took care to learn about the business, listening in on sales meetings and taking notes. Eventually, he was promoted to machine operator, although he simultaneously remained on the sanitation crew.

37.    In the 1980s, Mr. Montañez had more opportunities to show initiative. Frito-Lay implemented a Method and Improvement program whereby employees (in any station) were encouraged to come up with ideas for new products or improvements to existing products. In exchange for their efforts, employees were paid $1 per idea. At a time where every dollar counted, Mr. Montañez began submitting ideas for new products to Frito-Lay.

38.    This dovetailed with 38-year-old Roger Enrico's appointment as CEO of PepsiCo. In 1989, Mr. Montañez was inspired by a videotape issued as part of PepsiCo/Frito-Lay SharePower Stock Option Plan Rollout (pictured below) wherein Mr. Enrico encouraged employees at all levels of PepsiCo/Frito-Lay to "act like owners."



39. Mr. Montañez took Mr. Enrico's message to heart, and felt empowered and motivated to invent new snacks with certain flavor profiles that would better match the taste palates of the Hispanic community, which had not been well-served by the flavor choices previously available to them.

40. Thereafter, Mr. Montañez, with help from his wife Judy, began studiously working on a number of snack foods and flavors—including spicy, lime and chile, and cinnamon—intended to appeal to Hispanic consumers. Their creations included a wet salsa and a spicy dry chili powder used to season Cheetos, Fritos, and popcorn snacks. They also developed Fritos snacks flavored with lime and chile, as well as Doritos flavored with cinnamon.

### III. Mr. Montañez Creates Flamin' Hot Cheetos.

41. In the case of what would become the ubiquitous Flamin' Hot Cheetos, the development process started when a machine used to produce Cheetos in the Rancho Cucamonga plant broke down. This breakdown left a batch of unflavored Cheetos that had not been dusted with the normal cheese flavoring. Mr. Montañez took this unflavored batch of Cheetos home and, in his own kitchen, experimented by seasoning them with chili powder. He drew inspiration from elote—Mexican grilled corn seasoned with chili powder. Mr. Montañez continued to develop this spicy Cheetos concept until he created what he believed to be a snack that would be very popular among, and could be marketed directly to, the Latino community.

42. In 1991, Mr. Enrico became the CEO of Frito-Lay. That same year, Mr. Montañez called up Mr. Enrico's office to pitch his spicy Cheetos creation as well as the Hispanic marketing concept initially aimed at the local Hispanic communities in and around Mr. Montañez's native Southern California. After all, it was Mr. Enrico's inspirational video message that had encouraged Mr. Montañez to take ownership of the business and personally create a new potentially impactful product.

43. Mr. Enrico's assistant, Patti Rueff, recalls being shocked when she received the phone call. She and Mr. Montañez recounted the exchange with NPR:

> [NPR Producer]: First name in the directory, the CEO - Roger Enrico. His assistant answers, a woman named Patty Roof (ph).

-10-
COMPLAINT

Hello?

MONTAÑEZ: Hi. This is Richard Montañez. Can I talk to the CEO?

PATTY ROOF [SIC]: So I asked him, who do you work for? Where do you work?

GONZALEZ: This is Patty.

MONTAÑEZ: So I said, I work in California - Frito-Lay. She says oh, OK. You're the president of California?

ROOF: And he kept saying, no, I work at the Cucamonga plant.

MONTAÑEZ: Oh, you're the senior vice president of Southern Cali (ph) - I said, no, I work inside the plant.

ROOF: Are you in sales? And, no, I'm not in sales. Are you in research and development? No. Product development? No, I'm not in product development.

MONTAÑEZ: Are you have the plant director? No. Plant manager? No. What are you?

ROOF: You know, I'm a janitor. I almost fell out of my chair.

GONZALEZ: Richard tells Patty, I have an idea for the CEO.

ROOF: You know, the hotter the food, the more the Latinos like it. And it's, you know - we like spicy food, and Doritos and Cheetos just don't do it enough. So I put him through to Roger, and they spoke on the phone.

MONTAÑEZ: He said, I understand you have an idea for me. He goes, I'll be there in two weeks. I want to hear it.

*Hot Cheetos*, NPR.ORG (May 12, 2021), https://www.npr.org/transcripts/996228628.

44.     Although Mr. Montañez was a mere plant worker with no formal experience in the research and development of snack foods, his ideas intrigued Mr. Enrico enough that Mr. Enrico scheduled a time for Mr. Montañez to present his ideas to a group of Frito-Lay's top executives.

45.     Mr. Montañez spent the next couple of weeks studying whatever marketing materials he could find in the local public library, creating a product design for his spicy Cheetos snack, and putting together a presentation for the meeting.  These efforts culminated in Mr. Montañez donning a $3 tie, and walking into the meeting to pitch his snack and marketing concept.

46.     At one point, a marketing executive asked Mr. Montañez:  How much market share is up for grabs on this item?  Mr. Montañez was "ready to just run off the stage, so with the most ridiculous smile and statement, I raised out my arms, opened them wide up and said, this much market share.  And I could hear the marketing executives kind of like, oh, no, did he just — that's a

1 ridiculous statement." But Mr. Enrico saw the potential. He said: "Ladies and gentlemen, do you

2 realize that Richard just showed us how to get that much market share?" He opened his arms as

3 wide as Mr. Montañez. Mr. Enrico, the CEO, was on board.

4     47.    While this successful pitch meeting was not met with any immediate promotion,

5 Mr. Montañez got Frito-Lay's approval to move forward with his spicy Cheetos and his Hispanic-

6 geared marketing concepts.

7     48.    Shortly thereafter, Defendants set Mr. Montañez on what would prove to be, in

8 essence, a decades-long public speaking tour in which he chronicled his pitch for what would

9 become Flamin' Hot Cheetos, one of the most successful snack foods in the country. Indeed, in

10 1991, Mr. Montañez was chosen to travel to Washington, D.C., on behalf of PepsiCo and Frito-

11 Lay to engage with a number of Congressmen and tell them how he, a janitor, came up with the

12 next new product for the conglomerate. PepsiCo and Frito-Lay celebrated Mr. Montañez's

13 innovation in creating this new spicy Cheetos snack, and were never shy about touting his

14 accomplishments to the public.

15 **IV.    Despite Hostility and Discrimination from Frito-Lay's R&D Group, Mr. Montañez**

16 **Successfully Tests His Spicy Cheetos Concept and Brings It To Market Nationwide.**

17     49.    While Mr. Montañez's spicy seasoning was developed out of his home kitchen, this

18 was not conducive to the large scale production necessary to conduct a meaningful test market, let

19 alone nationwide distribution and sale. Accordingly, Mr. Montañez was directed to Frito-Lay's

20 research and development ("R&D") department in Texas to further develop his spicy Cheetos

21 concept for mass production.

22     50.    Unfortunately, he met with resistance from Frito-Lay's R&D group. Frito-Lay's

23 R&D scientists exhibited disapproval and hostility toward Mr. Montañez, turning their noses up at

24 his development of a spicy Cheeto snack in his home kitchen, rather than their state-of-the-art

25 R&D laboratories.

26     51.    R&D personnel continually asked Mr. Montañez to make and send more samples

27 of his spicy flavoring, but excluded him from any discussions that related to his seasoning

28 formulation, or that involved Frito-Lay's seasoning supplier, McCormick. Dissatisfied that Mr.

1   Montañez—a poor, uneducated Mexican plant worker and janitor—had successfully developed a

2   new product, Frito-Lay's R&D personnel completely shut out Mr. Montañez from the

3   development process.

4       52.    In addition to excluding Mr. Montañez from further development of his spicy

5   Cheetos seasoning, Frito-Lay's R&D department refused to invest the same levels of funding and

6   manpower in this product that would typically be employed in developing a new product.  For

7   example, while new product development typically requires approximately ten R&D scientists to

8   ensure proper manufacturing and good product quality—*e.g.*, proper flavoring coverage, proper

9   cooking temperature, balanced salt content, proper oil levels—only one was sent to Rancho

10  Cucamonga to help develop Mr. Montañez's spicy Cheetos snack.

11      53.    Despite the Frito-Lay R&D group's underwhelming support for development of

12  Mr. Montañez's new spicy Cheetos snack, eventually, a batch of 50-pound bags of Mr.

13  Montañez's spicy seasoning arrived from McCormick to the Rancho Cucamonga plant.

14      54.    Mr. Montañez and his colleagues at the Rancho Cucamonga plant used these bags

15  to produce the initial test batch of about 2,000 cases, in order to test the product in South El Monte

16  and Paramount for about three months.  The test markets were successful—due in no small part to

17  Mr. Montañez's guerilla marketing, as he encouraged friends and family to buy the product and

18  talk it up in-store.  Mr. Montañez also began giving the product away at parks, car shows,

19  churches and the like.  These exhaustive efforts paid off.  In 1992, Frito-Lay rolled out Flamin'

20  Hot Cheetos nationwide.

21      55.    While Defendants have attempted to roll out a counter-narrative in recent years,

22  their version of events simply does not hold up.  Al Carey, former CEO of Frito-Lay, was Vice

23  President of National Sales and Division President of Frito-Lay West during the time Mr.

24  Montañez was developing Flamin' Hot Cheetos.  In the wake of the recent controversy, he has

25  again publicly explained that Mr. Montañez invented the product.  *See, e.g.*, Sam Dean, *The Man*

26  *Who Didn't Invent Flamin' Hot Cheetos*, *supra* ("Carey insisted that Montañez is the creator of

27  Flamin' Hot Cheetos.")

28      56.    According to statements made by Frito-Lay and its former employees, beginning in

2402562.6

-13-

COMPLAINT

1  or around 1990, Frito-Lay's R&D group had started testing spicy snacks using the name Flamin'

2  Hot in certain Midwestern markets such as Detroit, Chicago, and Houston in light of the rising

3  popularity of spicy snacks among African American consumers.  Mr. Montañez was unaware of

4  these product developments or test markets, and has never claimed to have been a part of them.

5  Instead, Mr. Montañez was focused on developing his spicy seasoning out of his home kitchen

6  while drawing inspiration from Mexican street food and developing a marketing campaign that

7  would appeal to Hispanic communities.

8      57.    At the time, Frito-Lay was divided into five geographic divisions that were each

9  run independently with their own executive teams.  Mr. Montañez, who worked within the Frito-

10  Lay West division, was unaware of what the other divisions—including the Midwest (or

11  Metroline) division, which carried out test markets in their own region—were doing.  Only

12  recently has it become clear that the discriminatory and hostile treatment that Mr. Montañez

13  endured from Frito-Lay's R&D group was intended to discourage or disadvantage the

14  development of Mr. Montañez's spicy Cheetos in order to heavily favor the Midwest division's

15  formulation, spearheaded by more traditional R&D employees.

16      58.    Indeed, in 1993, at the invitation of Dennis Heard, Mr. Montañez scheduled a

17  three-day trip to the Frito-Lay R&D center in Irving, Texas.  Mr. Heard showed Mr. Montañez the

18  facilities, including the laboratories and factories within the R&D complex, and told Mr.

19  Montañez that he needed a Ph.D. to do this type of work.  Mr. Heard told Mr. Montañez to stop

20  submitting new product ideas to Mr. Enrico because Mr. Enrico kept rerouting those products to

21  Mr. Heard and the R&D department.  Mr. Heard's secretary even insisted that Mr. Montañez refer

22  to Mr. Heard as "Dr. Heard."  Mr. Montañez's trip was scheduled for three days, but was abruptly

23  ended after only a day and a half.  At the time, Mr. Montañez had no reason to suspect that these

24  actions were borne of discriminatory animus, because Defendants were still publicly crediting him

25  with the invention of Flamin' Hot Cheetos.  Defendants' recent heel-turn has made clear that R&D

26  was working to stifle and discredit Mr. Montañez from the outset.

27      59.    In any event, after his successful test market and the nationwide roll out of Flamin'

28  Hot Cheetos, the product's popularity (and sales) took off.  Flamin' Hot Cheetos currently

1  generate hundreds of millions of dollars in annual revenue for Frito-Lay and PepsiCo, and the

2  snack itself has gone on to become a cultural icon, particularly among the Latino community.

3  (*See, e.g.*, Fernando Hurtado, *From chips to memes: How Flamin' Hot Cheetos became a cultural*

4  *icon for U.S. Latinos*, NBCCHICAGO.COM (updated on Sept. 14, 2023)

5  https://www.nbcchicago.com/celebrating-hispanic-heritage/from-chips-to-memes-how-flamin-hot-

6  cheetos-became-a-cultural-icon-for-u-s-latinos/3228113/.)  They have inspired rap songs and

7  music videos, social media characters and memes, any number of Flamin' Hot flavored foods

8  (even pizza and ice cream), merchandise, and apparel.  Even pop superstar Katy Perry once

9  donned a Flamin' Hot Cheeto costume for a celebrity Halloween party in 2014.

10  **V.    Mr. Montañez's Continuing Success at Frito-Lay**

11        60.    In 1993 and 1994, Mr. Montañez continued to innovate and create new snack food

12  products.  He followed up on his creation of Flamin' Hot Cheetos by launching the Sabrositas line

13  of snacks that were also developed for and marketed to Hispanic consumers.  The Sabrositas line

14  included snacks such as Flamin' Hot Popcorn, Flamin' Hot Fritos, Lime and Chile Fritos, and

15  buñuelito-style Doritos.

16        61.    Roberto Siewczynski, an outside advertising consultant involved with the test

17  market for the Sabrositas marketing campaign, visited the Rancho Cucamonga plant and was

18  surprised to learn that the Sabrositas project was driven and led by Mr. Montañez and other

19  production/distribution workers, without the involvement of traditional company management.  As

20  he told the Los Angeles Times:  "It was, 'Hey, the plant really wants to do this; Richard really

21  wants to do this,' and they cut out a lot of the traditional management.'"  Sam Dean, *The Man*

22  *Who Didn't Invent Flamin' Hot Cheetos*, *supra*.

23        62.    Throughout his time at Frito-Lay and PepsiCo, despite the discrimination and

24  obstacles he faced, Mr. Montañez continued to rise through the ranks and received recognition for

25  his enormous contributions to the company, including, but not limited to, the following:

26

27

28

a.  Undated handwritten note from Mr. Enrico stating: "I am as proud of you as I would be if we were born brothers. Keep up the great work you do and, just as important, never lose your enthusiasm for self-growth. It is a real inspiration to all who come in contact with you."



b.  February 1992 publication entitled TEAM FRITO that features Mr.
Montañez just below the table of contents and on the opposing page of a
message from Mr. Enrico, advertising an article regarding "Empowerment."
As Mr. Enrico writes on the opposing page:  "To help launch TEAM
FRITO, we've included a feature article on how 'Empowerment' and
'Ownership' are igniting changes and growth throughout our company.
Empowerment isn't just another program,' it's a fundamental change in the
way we do business that emphasizes the importance of every associate
taking ownership for the results of their work"—something Mr. Montañez
had become an expert in.



c. April 8, 1992 letter from Mr. Enrico acknowledging that Mr. Montañez's spirit of dedication and excitement "really makes the difference" and that he is glad to have Mr. Montañez and all the Cucamonga owners on the team:

Frito-Lay, Inc.

Roger A. Enrico
Chairman & CEO

April 8, 1992

Mr. Richard Montanez
Frito-Lay, Inc.
9535 Archibald Avenue
Cucamonga, CA 91730

Dear Richard:

Thank you for your kind note and generous invitation. It's your spirit of dedication and excitement about what we're accomplishing as a team that really makes the difference. It's what made Frito-Lay successful and will define our future greatness as well.

I'm glad to have you and all the Cucamonga owners on the team. Let's make '92 our best year ever.

Best regards,

Roger A. Enrico

RAE:pg

7701 Legacy Drive Plano, Texas [illegible] 214 334 3952 P.O. Box [illegible] Dallas, Texas [illegible]



d. November 2, 1992 letter from Dwight R. Riskey, Frito-Lay Vice President of Marketing Research & New Business, thanking Mr. Montañez for sending red tortilla chips for evaluation and noting: "As always, we appreciate your innovation and initiative."

Frito-Lay, Inc.

Dwight R. Riskey
Vice President, Marketing Research & New Business

November 2, 1992

[redacted]
Mr. Richard Montanez
Frito-Lay, Inc.
9535 Archibald Avenue
Cucamonga, CA 91730

Subject: Red Tortilla Chips

[redacted]

Thanks for sending the red tortilla chips for our evaluation. I have passed them along to our consumer testing function for evaluation. As always, we appreciate your innovation and initiative.

Sincerely,

Dwight Riskey

DRR/jr
1016.2

[illegible] Legacy Drive Plano, TX [illegible] [illegible] P.O. Box [illegible] Dallas, Texas [illegible]

e. November 30, 1995 letter from Jim Rich, Frito-Lay Vice President of Field Support, congratulating Mr. Montañez on the success of his Sabrositas brand and noting "Cucamonga continues to grow and continues to surprise us all."

Frito Lay

Jim Rich
Vice President Field Support

November 30,1995

Richard Montanez
Cucamonga Plant

Congratulations on the 95 successes of your brand Sabrositas. A potential for annualized sales of $4 million dollars is nothing to 'sneeze at'. The next time I'm in the area, I would enjoy a market tour and a chance to see some good friends in Cucamonga. I still remember my first visits to Cucamonga in 1991. The concern was volume and performance, alot has happened since...the people in Cucamonga have kept the bargain and so has Frito Lay. Cucamonga continues to grow and continues to surprise us all.

Keep up the great work and say hello to all in Cucamonga.



f.     Undated handwritten from Mr. Enrico stating: "Congratulations on your
success in moving the Hispanic line to the streets!  I look forward to hearing
great things about the results."

g.  Undated handwritten note from Mr. Enrico stating: "Have sent your product lineup for the Hispanic market to Steve R. for his evaluation."



h.  A 2003 dinner gala in Washington, D.C., with top Latino leaders from around the country, which Mr. Montañez attended with then PepsiCo Chairman and CEO, Steven Reinemund.

i.    A 2007 award ceremony honoring Mr. Montañez at a PepsiCo sales meeting in front of thousands of PepsiCo employees pictured below with then-PepsiCo CEO, Ms. Nooyi; PepsiCo President, John Compton; PepsiCo President of Global Sales, Tom Greco; and PepsiCo Senior Vice President of Multicultural Sales and Marketing, Marie Quintana.



j.    A 2016 special award dinner in Mr. Montañez's honor celebrating the 40th anniversary of his employment at PepsiCo and attended by PepsiCo executives including Kirk Tanner, President and Chief Operating Officer for North America Beverages, and PepsiCo's head of HR.

63.    In 1992, after the launch of Flamin' Hot Cheetos, Defendants sent Mr. Montañez across the country to tell his story at a number of plants, including ones that were performing poorly, in order to inspire the workforce and boost morale. Defendants deployed this tactic numerous times over the years; for instance, from 2009 to 2013, Frito-Lay again sent Mr. Montañez on another nationwide tour to tell his story of the invention of Flamin' Hot Cheetos and to address unions at various plants.

64.    In 1993, Mr. Enrico awarded Mr. Montañez the Chairman's Award, PepsiCo's highest honor. He went on to receive the award three more times (in 1995, 1997, and 2007), more than any other Frito-Lay/PepsiCo employee.

65.     In 2000, more than twenty years after he first started at Frito-Lay/PepsiCo, and after he created dozens of hit snack products, Mr. Montañez was finally promoted off the line to become Frito-Lay's Southern California Business Development Manager.  He was later promoted to Vice President of Multicultural Marketing & Sales at PepsiCo.

66.     In 2007, with the support of PepsiCo and Frito-Lay, Mr. Montañez began publicly telling his story about his invention of Flamin' Hot Cheetos, from the development of the seasoning in his home kitchen to becoming entrenched as a globally recognized and iconic snack. This led to speaking engagements at corporate retailing giants such as Walmart and Target, as well as educational institutions such as Harvard University and the University of Southern California. Defendants not only pushed Mr. Montañez to give these speeches, they expressly reviewed and approved the same.

67.     Photos of some of Mr. Montañez's engagements representing, and for the benefit of, PepsiCo and Frito-Lay include the following:

        a.     A 2012 fireside chat at Target headquarters with CEO Brian Cornell to share the story of Mr. Montañez's career.  Mr. Cornell personally contacted then CEO of PepsiCo, Indra Nooyi, for permission to have Mr. Montañez participate.





b.    A 2013 conference in Miami with Ms. Nooyi to honor top Hispanic business leaders.



c.    A 2012 interview in Atlanta with Soledad O'Brien, with whom Mr. Enrico, in an earlier interview, had shared Mr. Montañez's story.

1
2
3
4
5
6
7
8
9
10
11
12
13



14      d.      A 2005 speaking engagement at Walmart headquarters to share the story of

15              his career.  Between 2003 and 2016, Mr. Montañez was invited by two

16              different Walmart CEOs to be a featured speaker at corporate events.

17
18
19
20
21
22
23
24
25
26
27
28



e.    A 2018 speaking engagement at Harvard University where Mr. Montañez spoke alongside Walmart CEO Doug McMillon.



f.    A private presentation at UCLA with Ms. Nooyi and guests David C. Lizárraga and Priscilla Lizárraga of TELACU, a community development corporation committed to serving, empowering, advancing, and creating self-sufficiency within urban, underserved communities.



g.    PepsiCo and Frito-Lay also made travel arrangements for Mr. Montañez's speaking engagements, including via private jet.  Exemplar photographs are provided below, which picture Mr. Montañez, along with PepsiCo CEO Al Carey and others, traveling to New York to attend a gala put on by the Hispanic Association on Corporate Responsibility.





68.    One thing is clear:  over the following decade, PepsiCo and Frito-Lay did not dispute Mr. Montañez's story of inventing Flamin' Hot Cheetos.  Quite the contrary; they *gave Mr. Montañez credit* for inventing the product.  PepsiCo and Frito-Lay went so far as to include

1  Mr. Montañez's story as an inspirational example in training videos for new employees, paid for

2  his flights and hotels to travel around the country and tell his story, and approved all press events

3  and speeches that Mr. Montañez gave regarding his creation of Flamin' Hot Cheetos.  The public

4  loved Mr. Montañez's life story—from growing up poor with no high school diploma, to creating

5  the incredibly popular Flamin' Hot Cheetos, to becoming a top-level executive at a major

6  international company.  PepsiCo and Frito-Lay were happy to use Mr. Montañez as an

7  inspirational brand ambassador to build invaluable public goodwill, sell more products, and reap

8  the financial benefits.

9       69.     The demand for Mr. Montañez's speaking engagements continued to swell into the

10  2010s.  Starting in 2016, Mr. Montañez began receiving offers and opportunities for speaking

11  engagements through the Capitol City Speakers Bureau and the Washington Speakers Bureau.

12  These arrangements generated up to approximately 36 speaking engagements per year for Mr.

13  Montañez, for which he was able to command prices from $10,000 to $50,000 per engagement.

14       70.     Eventually, demand for Mr. Montañez's speaking engagements got to be so great

15  that, in 2019, he retired from PepsiCo/Frito-Lay in order to more actively pursue a second career

16  as a motivational speaker, along with consultancy projects, among other things.

17

18

19

20

21

22

23

24

25

26

27

28

71.    But the mark Mr. Montañez left on Frito-Lay/PepsiCo is indelible.  Two years before he retired, in commemoration of his 40 years of service to the company, Indra Nooyi, Chairwoman and CEO of PepsiCo, provided Mr. Montañez with a poster commemorating his innumerable accomplishments—Flamin' Hot Cheetos being chief among them—confirming Mr. Montañez had been dubbed "the Godfather of Hispanic Branding":



VI.    **Mr. Montañez Publishes Two Memoirs and the *Flamin' Hot* Movie Goes into Production.**

72.    The public was so interested in Mr. Montañez's life story that, in 2013, Mr. Montañez published a memoir entitled *A Boy, a Burrito, and a Cookie: From Janitor to Executive*. It chronicled his rags-to-riches life story, explaining how the son of an immigrant laborer who

grew up poor and lacked a formal education still managed, through hard work and perseverance, to advance from a janitor to the inventor of one of Frito-Lay's most popular snacks, eventually becoming a senior marketing executive at major international company PepsiCo, and the resident expert on marketing to the Hispanic community.

73.     Former PepsiCo CEO Steve Reinemund encouraged Mr. Montañez to write this first memoir, and PepsiCo even funded edits to the book.  Upon the book's publication, Defendants' Government Affairs department purchased 1,000 copies of the book.  After the book was published, Defendants made additional arrangements for Mr. Montañez to meet with numerous elected officials, including two trips to the White House (*see* photos below), to recount his story of inventing Flamin' Hot Cheetos.



74.     In June 2021, Mr. Montañez published his second memoir, *Flamin' Hot: The Incredible True Story of One Man's Rise from Janitor to Top Executive*.  Defendants' praised the book, as evidenced on the book jacket—an excerpted quote featured on the book jacket from Ms. Nooyi is below:

"Richard's story is a tour de force."
—Indra Nooyi, chairwoman and former CEO of PepsiCo

1      75.    Studios were exceedingly interested in turning Mr. Montañez's life story into a full-

2  length feature film.  After months of bidding wars, eventually, Searchlight Pictures (a film

3  production and distribution arm of Walt Disney Studios) signed on to distribute the film, with

4  notorious producer DeVon Franklin set to produce.  The film, to be entitled *Flamin Hot*, was to be

5  directed by the acclaimed Eva Longoria.  The film was set to tell the inspiring story of Mr.

6  Montañez's rise from humble beginnings to Frito-Lay janitor to creator of the global sensation

7  Flamin' Hot line of Frito-Lay snacks by channeling his Mexican heritage.  The film was

8  eventually released on June 9, 2023 on the Disney+ and Hulu streaming platforms.

9      76.    Everything seemed good in Mr. Montañez's life.  But, before long, Defendants

10  implemented a plan to discredit Mr. Montañez, disrupting his life and livelihood.  Indeed, as Lupe

11  DeLaCruz III, then-PepsiCo Senior Director of Government Affairs, had foreshadowed in a

12  warning to Mr. Montañez in 2017, PepsiCo's legal team was fuming about the attention that Mr.

13  Montañez was receiving, and they were "out to get him."  Mr. DeLaCruz had also been instructed

14  to no longer speak with Mr. Montañez.  Mr. Montañez did not give these comments credence at

15  the time, given other high-level executives employed by Defendants continued to support him, and

16  Defendants had yet to give him any reason to believe Mr. DeLaCruz's accusations.

17  **VII.    An LA Times Article Claims Mr. Montañez Did Not Invent Flamin' Hot Cheetos.**

18      77.    On or about May 16, 2021 (just before Mr. Montañez's second memoir was

19  released), Sam Dean, a business reporter for the Los Angeles Times ("LA Times") published an

20  article purporting to discredit Mr. Montañez, claiming he did not, in fact, invent Flamin' Hot

21  Cheetos.  (Sam Dean, *The Man Who Didn't Invent Flamin' Hot Cheetos*, *supra*.)  Despite carrying

22  the salacious headline, "The Man Who Didn't Invent Flamin' Hot Cheetos," the story falls well

23  short of substantiating such a bold claim against Mr. Montañez, as it misstates and omits key facts.

24      78.    But the worst part?  Defendants feeding the reporter false information to hurt Mr.

25  Montañez.

26      79.    The article cites interviews with more than a dozen former Frito-Lay employees—

27  one of whom, Lynne Greenfeld (who now goes by Lynne Lemmel), reached out to Frito-Lay in

28  2018 to allege that Mr. Montañez was falsely claiming to have invented Flamin' Hot Cheetos.

1   The article also cites information gathered by Frito-Lay as part of an internal investigation into the

2   creation of Flamin' Hot Cheetos prompted by Ms. Greenfeld's allegation.  The materials from the

3   2018 Frito-Lay internal investigation were provided to the LA Times, along with a statement by

4   Frito-Lay, which was quoted throughout the article.

5        80.      The defamatory and misleading article not only derailed the release and reception

6   of Mr. Montañez's second memoir, but put production of the film based on the book in grave

7   jeopardy.

8        81.      During production of *Flamin' Hot*, an unidentified female counsel for

9   PepsiCo/Frito-Lay contacted DeVon Franklin, the movie's producer, to obtain information from

10  him about the film and Mr. Montañez so that she could relay that information to Lynne Greenfeld

11  and executives at PepsiCo/Frito-Lay.  Mr. Montañez is informed and believes and thereon alleges

12  that this unidentified female counsel from PepsiCo/Frito-Lay is the person who provided Sam

13  Dean with many of the negative statements about Mr. Montañez and his involvement in the

14  creation of Flamin' Hot Cheetos that ultimately made their way into the LA Times article

15  discrediting Mr. Montañez.

16       82.      As made apparent throughout the article, these sources are problematic across the

17  board.  While they claim to debunk Mr. Montañez because he was not involved in a 1990 test

18  market conducted by Frito-Lay's Midwest/Metroline division for spicy snacks in certain cities

19  including Detroit, Chicago, and Houston, this does not contradict Mr. Montañez's account of

20  events, as the article and its sources claim.  Mr. Montañez has never claimed to have been a part of

21  the 1990 Midwest test market, or to have even known what any other divisions of Frito-Lay were

22  developing at that time.  Mr. Montañez worked out of his home kitchen to develop a spicy

23  seasoning for Cheetos that was inspired by Mexican street food.  He worked through the Frito-Lay

24  R&D group's resistance to successfully test his product in Southern California markets and

25  ultimately bring to market Flamin' Hot Cheetos.  Al Carey—who, around this time, became CEO

26  of Frito-Lay's West division and personally knew of Mr. Montañez's development of Flamin' Hot

27  Cheetos—has publicly confirmed that Mr. Montañez is the person who invented them.  (*See, e.g.*,

28  Kristen Cloud, *PepsiCo's Carey Ignites The Front Line To Drive Results*,

1     THESHELBYREPORT.COM (May 3, 2013), https://www.theshelbyreport.com/2013/05/03/pepsicos-

2     carey-ignites-the-front-line-to-drive-results/ ("'Long story short,' Carey said, 'Richard is the one

3     that invented the Cheetos Flamin' Hot product.'").)  Interestingly, the article makes no mention of

4     Mr. Montañez's separate Southern California test market of his spicy Cheetos snack.

5           83.     The LA Times article also exhibits the same negative bias toward Mr. Montañez

6     that he faced from Frito-Lay's R&D department.  The article states that a "team of hotshot snack

7     food professionals," including a "freshly minted MBA," came up with the Flamin' Hot Cheetos

8     product and name, and unfairly implies that an uneducated plant worker of Mexican descent such

9     as Mr. Montañez could not have created such a successful snack.  This echoes the sentiments of

10     Frito-Lay R&D scientists, one of whom intimated to Mr. Montañez that he needed a Ph.D. to

11     develop new snacks and flavors at Frito-Lay.

12           84.     The sources for the LA Times article had an ulterior motive for participating in the

13     article—Ms. Greenfeld and other former Frito-Lay employees want to take the credit for Flamin'

14     Hot Cheetos for themselves.  The article quotes Fred Lindsay, a retired Frito-Lay salesman from

15     the South Side of Chicago, as having said, "I'm the one that was responsible for getting us into

16     Flamin' Hot products."  The article also quotes Ms. Greenfeld as saying, "I came up with the

17     Flamin' Hot name on my own."  For years, PepsiCo and Frito-Lay credited Mr. Montañez with the

18     invention of Flamin' Hot Cheetos, using his story to inspire new employees or to gain goodwill

19     through public speaking events.  So, in order to take credit for Flamin' Hot Cheetos for

20     themselves, they would certainly first need to discredit Mr. Montañez.

21           85.     At the same time, the article disregards unequivocal statements by Mr. Carey that

22     Mr. Montañez, in no uncertain terms, is the creator of Flamin' Hot Cheetos.  Mr. Carey was there

23     with Mr. Montañez when he prepared his spicy Cheetos and conducted test markets in Southern

24     California over a period of three months.  Of all people, he would know the truth regarding Mr.

25     Montañez's efforts to develop this spicy Cheetos snack.  Yet the LA Times article inexplicably

26     concludes that Mr. Montañez definitively did not invent Flamin' Hot Cheetos.  And in a world

27     where salacious headlines and clickbait journalism reign supreme, this unsupported conclusion is

28     enough to destroy a man's reputation, legacy and livelihood.

86.     After the LA Times article was published, Mr. Montañez received a Direct Message on Instagram from a woman named Rachel.  In the message, Rachel offered her opinion on why Dean might have written the article in the way that he did:

> Hi Richard!  I hope you're well.  Long time (lifelong really) Hot Cheetos fan.  I listened to your Planet Money episode, and it was like listening to my dad speak.  You feel so familiar to me!  I'm sorry the LA Times article was written so poorly.  That writer is my ex-boyfriend and I genuinely think he wrote it because he's bitter and wanted to get back at me.  I'm sorry that he's taking it out publicly and oddly!  You're the man!

87.     One of the most egregious statements in the article was a quote attributed to Frito-Lay that called Mr. Montañez's contributions to the Flamin' Hot brand an "urban legend."  This misleads the public into believing that Mr. Montañez is a fraudster who is spinning a tale created out of whole cloth.  After championing Mr. Montañez for decades as the creator of Flamin' Hot Cheetos and an inspirational figure to be looked up to both within the Frito-Lay/PepsiCo organization and without, Frito-Lay suddenly cut Mr. Montañez down.  Mr. Montañez suddenly found himself under attack from the very organization and people to whom he had devoted more than 40 years of his life.

88.   Mr. Montañez's supporters aimed to clear the air by reiterating that he did, in fact, invent Flamin' Hot Cheetos.  For instance, Mr. Enrico's longtime secretary Patti Rueff disseminated the following email to Mr. Montañez's detractors:

Please let me introduce myself.  My name is Patti Rueff and I was Roger Enrico's executive assistant for over 20 years.  Since everyone is so interested in debunking Richard Montanez's history with Frito-Lay, I'd like to set the record straight as I did with the LA Times Reporter who totally had his own agenda and totally disregarded all that we talked about for his article.

Have any of you seen the movie?  If so, you'd see that Richard called Roger after much angst to pitch his idea for a new product for Cheetos that would appeal to the Hispanic community.  *I AM THE PERSON WHO TOOK HIS CALL.*  I listened to his pitch, which was confident (yet respectful), full of passion (yet humble) and thoroughly thought out.  Something about him struck a chord in me and *I AM THE ONE WHO PUT THE CALL THROUGH TO ROGER.*  This is 100% fact – not fiction.  As you may know, Roger was a marketing genius, and he knew a good idea when he heard one.  He in fact did ask me to set up a meeting with Richard the next time he did a plant tour in CA.  And the rest is history.

When the LA Times reporter was doing his due diligence, he called the Frito-Lay headquarters in Plano who: #1, did not have any idea who created Flamin' Hot Cheetos and #2, told him there was NO RECORD of me ever working at Frito-Lay.  Hmmm … I guess working there for many years, meeting my husband and getting married in Dallas is not true.  A little further digging would have told him my last name was not Rueff at the time.  When the reporter kept saying that a woman in the Midwest had claimed that she and her team created the brand, no one could corroborate her story.  There was obviously no one left at Frito-Lay to know the story.  At that point, PepsiCo recanted their denial of Richard and issued a new statement that there was no reason to not believe Richard's account.

Richard and I stayed close for many years – and we still are.  He was promoted at Frito-Lay over and over again, and no janitor would have been made Director of Hispanic Relations for doing nothing.  PepsiCo flew him all over the United States on the corporate jet to speak and tell his inspirational message.  This is not someone who just mopped floors.

I'm an Italian so I'm probably coming off as a little strong … but I'm passionate about this because the haters need to stop hating and instead celebrate a feel good, follow your passion story like Richard's.

Hope I've been able to change your mind.  I feel like it's my obligation to Richard … and to Roger.

Patti

89.   Nonetheless, the negative press did not let up.  The LA Times article was so problematic that, just five days later, on May 21, 2021, Frito-Lay issued a statement clarifying that Mr. Montañez's contributions were "far from being an urban legend" and that the information Frito-Lay shared with the L.A. Times was "misconstrued" and "resulted in confusion."  (Gene Maddaus, *PepsiCo Defends Richard Montañez, Claims Earlier Statements Were 'Misconstrued'*, VARIETY.COM (May 21, 2021), https://variety.com/2021/film/news/pepsico-defends-richard-montanez-claims-earlier-statements-were-misconstrued-1234979160/.)

90.     This half-hearted clarification was simply too little, too late.  While Defendants stated that they "ha[d] no reason to doubt the stories [Mr. Montañez] shares about taking the initiative to create new product ideas for the Cheetos brand, and pitching them to past PepsiCo leaders," this far from endorses his version of events, which makes clear he invented Flamin' Hot Cheetos. *Id.*

91.     Around the same time, Frito-Lay provided additional information to Sarah Aida Gonzalez of National Public Radio's "Planet Money" podcast, which had previously aired an episode featuring Mr. Montañez.  On May 17, 2021, Gonzalez posted a series of 14 tweets on the social media platform Twitter (now called X) explaining what Frito-Lay had clarified to her based on the results of their investigation into the origin of Flamin' Hot Cheetos:

- Frito-Lay refused to say that Mr. Montañez was not involved in the creation of Flamin' Hot Cheetos, instead admitting that "He was part of it";

- Former employees recall a small California-based marketing team developing a Mr. Montañez product, the product doing very well in a test market in Southern California;

- Former Frito-Lay R&D members recall samples being submitted from the Cucamonga plant to Frito-Lay R&D headquarters and that these samples may have possibly been Flamin' Hot seasoning;

- Two former Frito-Lay employees remembered the product samples involving Cheetos;

- Al Carey and Jim Rich attended a meeting at the Cucamonga plant during which Mr. Montañez and two other employees pitched a number of products, including spicy Cheetos;

- Frito-Lay acknowledged the possibility that the 1989-1990 product test of Hot Cheetos in the Midwest markets could have been happening at the same time as test markets of the Cucamonga product in Southern California markets; and

- At the time of the Cucamonga plant meeting, Frito-Lay North America was divided into independently operating divisions with separate executive teams, and the West

1  Division may not have been aware of Metroline (Midwest) products or tests.

2  Sarah Aida Gonzalez (@GonzalezSarahA), TWITTER.COM (May 17, 2021, 1:25 PM),

3  https://twitter.com/GonzalezSarahA/status/1394388743042174978.

4      92.      Again, none of these statements expressly endorse Mr. Montañez's version of

5  events, and served only to fuel the fire.  Media publications ran with this sudden discord, including

6  the LA Times, which continued to exhibit its bias against Mr. Montañez.  For instance, the

7  *Flamin' Hot* film's success was severely impacted by Defendants' false accusations.  Gustavo

8  Arellano's column reviewing the film begins by accepting as gospel truth that Mr. Montañez "was

9  a fibber at best and a fabulist at worst," based on Defendants' earlier statements to the publication.

10  *See, e.g.*, Gustavo Arellano, *Column: Why the Flamin' Hot Cheetos Movie Is Both Pandering and*

11  *Pernicious*, LATIMES.COM (June 13, 2023), https://www.latimes.com/california/story/2023-06-

12  13/flamin-hot-movie-cheetos-eva-longoria.)  This column disparages *Flamin' Hot*, failing to

13  impartially consider the film, or the evidence making clear that Mr. Montañez told the truth about

14  his creation of Flamin' Hot Cheetos (such as statements by Al Carey, former colleagues of Mr.

15  Montañez, and even Frito-Lay themselves).

16      93.      And instead of celebrating Mr. Montañez as a "genius" bold enough to pitch

17  Flamin' Hot Cheetos to his Frito-Lay bigwigs like he did for a KQED article just four years prior,

18  (Bianca Taylor, *Flamin' Hot Cheetos: The Humble Beginnings of a Junk Food*, KQED.ORG (Mar.

19  15, 2019), https://www.kqed.org/news/11732648/flamin-hot-cheetos-the-humble-beginnings-of-a-

20  junk-food), Arellano, in his LA Times column, does a complete 180° and incorrectly laments that

21  the film's portrayal of Mr. Montañez as the creator of Flamin' Hot Cheetos relegates actual history

22  to a mere afterthought.

23      94.      The tides have turned on Mr. Montañez.  While prior Google searches would return

24  a myriad of hits on his inspirational story accrediting him with the creation of Flamin' Hot

25  Cheetos, now, the first things that come up are articles questioning the veracity of his story.

26  **VIII.  Public Statements Verify Mr. Montañez's Story**

27      95.      Prior to and since the controversy over the creation of Flamin' Hot Cheetos has

28  arisen, a number of Mr. Montañez's former colleagues have come forward to verify his story that

he created Flamin' Hot Cheetos.  They have provided their accounts in, for example, public
interviews, social media posts, or emails, and include the following:

    a.    A May 3, 2013 online article in The Shelby Report quoting Al Carey:
"'Long story short,' Carey said, 'Richard is the one that invented the
Cheetos Flamin' Hot product.'"  Kristen Cloud, *PepsiCo's Carey Ignites
The Front Line To Drive Results*, THESHELBYREPORT.COM (May 3, 2013),
https://www.theshelbyreport.com/2013/05/03/pepsicos-carey-ignites-the-
front-line-to-drive-results/.

    b.    The May 16, 2021 LA Times article by Sam Dean, which quotes Al Carey
as saying:  "The product that we know today as Flamin' Hot Cheetos was
definitely not out in the market . . .  That product was developed by those
guys in the plant . . .  Without Richard, this thing would not be out there."

c.   A May 16, 2021 email from Al Carey to David C. Lizárraga, Founder and
Chairman of TELACU Education Foundation (an organization that aims to
improve educational outcomes for first-generation students from under-
resourced minority communities) stating: "I told the LAT reporter that I
have been the most senior executive of Frito Lay and was there at the
inception of flamin hot with Richard."

> **From: Carey, Al** <▇▇▇▇▇▇>
> Date: Sun, May 16, 2021 at 9:45 AM
> Subject: Re: Los Angeles Times: The man who
> didn't invent Flamin' Hot Cheetos
> To: Dr. David C. Lizárraga <▇▇▇▇▇▇>
> CC: Richard Montañez <▇▇▇▇▇▇>
>
>
> This guy called me to get some information and
> after a while I realized that he was digging to find
> out information to discredit Richard.
> He called me back last night asking me to connect
> him to Richard.
> I told him absolutely not and the nugget of
> information he had about a 1990test market was
> explained if he dug further.
> I don't know who he called at FL ....he wouldn't tell
> me.
> But there is a woman who used to work at FL
> marketing, decades ago and started this
> story......but we knew it's not accurate.
> I have an interview with one of the TV stations that
> seems to be supportive of Richard's story ....
> I'll check before I do it....to make sure that it's a
> positive intention.
> I told the LAT reporter that I have been the most
> senior executive of Frito Lay and was there at the
> inception of flamin hot with Richard. Today it's
> $800mm per year in sales.
> You know, some people hate to see succeed.
> This quote is true....." success has many parents
> but failure is an orphan".

d.   A social media post by Luis Nunez commenting: "I was there helping
Richard Montanez testing the new product and the machines. I was a
maintenance technician at the plant, when we first tested the application. I
went home with flaming hot sauce up to my knees, my socks were red. It
was a good test for the equipment and application, those were just the
beginning, I got your back Richard."

e.    A social media post on Instagram by username "brittfromplaya" commenting:  "I interviewed with Pepsi Co (2016) and they shared this story – a man from janitor to creating the flaming hots chips, it was a motivational story to share. The movie may glamorize certain parts, it's a movie, but nonetheless true from what PepsiCo told me!"

 **brittfromplaya** 6h
I interviewed with Pepsi Co (2016) and they shared this story — a man from janitor to creating the flaming hots chips, it was a motivational story to share. The movie may glamorize certain parts, it's a movie, but nonetheless true from what PepsiCo told me!

3 likes   Reply

f.    A social media post on Instagram by username "slick1950" commenting:  "I remember working with you and your son so I laugh when people think they know what they talking about even when I did my orientation they told us your story."

 **slick1950** commented: I remember working with you and your son so I laugh when people think they know what they talking about even when I did my orientation they told us your story 1h 

g.  A social media post on Facebook by Manoj Narender Madnani

commenting: "Richard P {FLNA} Montanez you are an inspiration. I met

the late Roger Enrico whilst I was in Babson College and he mentioned

your initiative when he addressed us and how successful it was for PepsiCo.

To anyone in a leadership position; you never know where your next great

idea will come from; therefore be inclusive and not exclusive when you rise

up the ranks!"

**Manoj Narender Madnani** · 1st      1w (edited)  ···
Founder & CEO with a personal philosophy based...

Richard  P {FLNA} Montanez you are an
inspiration. I met the late Roger Enrico whilst I
was in Babson College and he mentioned your
initiative when he addressed us and how
successful it was for PepsiCo.
To anyone in a leadership position; you never
know where your next great idea will come from;
therefore be inclusive and not exclusive when you
rise up the ranks!

Like  ·  🖤 5   **Reply**

h.     A social media post on Facebook by Leah Box commenting: "I have my own insights as to Richard's story!!! In fact, he and I had many face to face conversations during his personal R&D crusade to meet the needs of the Hispanic market in LA!!! . . . While in [the Senior VP of R&D's] office, Richard took Snack Manufacturing magazines to get ideas on how to mass produce and distribute snack products with hot/spicey seasonings. My guess is there are 100's of us who could corroborate Richard's story!!!"



**Leah Box**
I have my own insights as to Richard's story!!! In fact, he and I had many face to face conversations during his personal R&D crusade to meet the needs of the Hispanic market in LA!!!

I have anecdotes that I could share that would add great validity AND interest to his story!!!

For example, the Senior VP of R&D was NOT interested in hearing the ideas of an hourly waged employee!!! (Let's be real – arrogance did occur in FL.) Richard met with him in person in Plano to pitch his idea at least one time, that I am aware of. While in his office, Richard took Snack Manufacturing magazines to get ideas on how to mass produce and distribute snack products with hot/spicey seasonings.

My guess is there are 100's of us who could corroborate Richard's story!!!

4h   Like   Reply       1 🔄

i.  A social media post on Facebook by Mike Fuller commenting: "I know Richard Montanez from the time I spent at the Cucamonga Plant and was at the plant when he presented his Hispanic flavor ideas to Roger Enrico and several other upper level FL managers. Richard went from working in Cucamonga processing/packaging operations to the Headquarters Marketing Team to support Multicultural Sales. Roger Enrico is dead and there are very few people left in Frito Lay now that go back to the late 1980's to mid 1990's timeframe that can provide an actual accounting how things went down. The media has picked this story up and is running it with a very slanted view in my opinion."

> **Mike Fuller**
> Admin · ···
> I know Richard Montanez from the time I spent at the Cucamonga Plant and was at the plant when he presented his Hispanic flavor ideas to Roger Enrico and several other upper level FL managers. Richard went from working in Cucamonga processing/packaging operations to the Headquarters Marketing Team to support Multicultural Sales. Roger Enrico is dead and there are very few people left in Frito Lay now that go back to the late 1980's to mid 1990's timeframe that can provide an actual accounting how things went down. The media has picked this story up and is running it with a very slanted view in my opinion.
>
> 10h   Like   Reply                              6 ○

## IX.   Fallout from Defendants' False Statements

96.   Despite this showing of public support from those who know and believe in Mr. Montañez, the fallout has been enormous. The internet is rampant with comments from individuals expressing distrust and feelings of betrayal after buying into Mr. Montañez's story. Recent comments on one Reddit thread dated a year ago demonstrate as much:

1

**DryTradition6576** · 1mo ago

2

People should call him out on it more. Dude is conman.

3

⬆ 1 ⬇   💬 Reply   ⬆ Share   ...

4

**Ninjurk** · 3mo ago

5

Yeah, and he didn't start yammering about his supposed role decades after they were invented.

6

He's a marketer. Trying to market himself and his story, and it'd be a good story if it was true.

7

⬆ 1 ⬇   💬 Reply   ⬆ Share   ...

8

**[deleted]** · 3mo ago

9

There litterally no pictures or documentation of anything this guy said he did, your telling me

10

you wouldn't of took some pictures of you making this spicy Cheetos dust with your family or documented it anyway? That's the shit that really makes you know it's a straight up lie....

11

⬆ 1 ⬇   💬 Reply   ⬆ Share   ...

12

**new_boom_action** · 5mo ago

13

He didn't invent them! What is the controversy here? He might have independently come up

14

with the idea of spicy Cheetos (how original...people put hot sauce on everything), but it is NOT

15

the same recipe. Spicy [insert literally anything], wow. He had literally decades to figure out that this product was not the thing that he created. Did he even taste one? But he took credit for it

16

anyway, wrote books, and went on speaking tours. His story was already very interesting...janitor ascends the corporate ladder to become an executive. Inspiring on its own. Why make up some

17

BS about inventing one of the company's most popular products when he DID NOT.

18

⬆ 1 ⬇   💬 Reply   ⬆ Share   ...

19

**thumper300zx2** · 8mo ago · Edited 8mo ago

20

So Richard Montañez is just another wealthy exec that takes credit for other peoples'

21

accomplishments. Sounds about right, and of course, horribly ironic given the theme of the movie.

22

Also, seeing what Flamin' Hot Cheetos look and taste like, while I watched the movie I think,

23

yeah, we're all eating the test tube version.

24

⬆ 1 ⬇   💬 Reply   ⬆ Share   ...

25

—

26

*TIL the legendary story about a janitor who came up with Flamin' Hot Cheetos was a lie.*,

27

REDDIT.COM,

28

https://www.reddit.com/r/todayilearned/comments/11ec0ap/til_the_legendary_story_about_a_janit

2402562.6

COMPLAINT

1 | or_who_came/?sort=new (last accessed April 26, 2024).

2 |     97.    This public outcry has directly affected Mr. Montañez. Since 2019, his income has
3 | derived primarily from speaking and consultancy engagements. Clients book these engagements
4 | with Mr. Montañez because of his inspirational story involving his creation of Flamin' Hot
5 | Cheetos and other snacks marketed to the Hispanic community. As a direct result of Defendants'
6 | false statements denying the veracity of Mr. Montañez's story (which Defendants were previously
7 | happy to tout for over a decade to benefit PepsiCo and Frito-Lay), Mr. Montañez's ability to
8 | secure these lucrative engagements at the rate and fees he previously demanded has been severely
9 | and negatively impacted.

10 |     98.    Prior to Defendants' false statements discrediting his creation of Flamin' Hot
11 | Cheetos, Mr. Montañez was booking dozens of lucrative engagements per year. For example, in
12 | 2020, Mr. Montañez's clients for engagements included, without limitation, Deloitte (multiple
13 | engagements), Notre Dame University, Adobe, General Mills, Granger, Tennessee Tech
14 | University, Wisconsin Bankers Association, Tennessee Bankers Association, S&P, Leadercast,
15 | and ASI. Many of these bookings were obtained through Capitol City Speakers Bureau and the
16 | Washington Speakers Bureau, and Mr. Montañez was able to charge approximately $10,000 to
17 | $50,000 per engagement.

18 |     99.    After the L.A. Times article was published on May 16, 2021, the number of Mr.
19 | Montañez's engagement opportunities shrank considerably. Yum Brand cancelled an engagement
20 | shortly after the article was published. Capitol City Speakers Bureau stopped pitching Mr.
21 | Montañez for engagements altogether. Washington Speakers Bureau, which used to generate
22 | about one engagement per month for Mr. Montañez, generated only two engagements during the
23 | entire year of 2022. Mr. Montañez had to sell his house as a result of his faltering income.

24 |     100.    Even for engagements that do not fall through, Mr. Montañez and his team are
25 | having to expend significantly more effort into conducting damage control and assuaging the
26 | concerns of client organizations that arise as a result of Defendants' false statements about Mr.
27 | Montañez not creating Flamin' Hot Cheetos.

28 |     101.    Defendants have made and continue to make false statements denying that Mr.

1   Montañez created Flamin' Hot Cheetos, despite numerous statements by Al Carey, Mr.

2   Montañez's former colleagues, and even Frito-Lay itself that corroborate Mr. Montañez's account

3   of events.  As a result, Mr. Montañez went from booking over 35 engagements per year to

4   booking approximately four in 2024.  Moreover, while previous engagements were typically

5   booked through speaker bureaus, now, most new bookings come directly through Mr. Montañez's

6   website and his audience has become predominantly limited to Latino or Hispanic organizations

7   and employee resource groups.

8   **X.     Lightbox Documentary Falls Through Because of PepsiCo/Frito-Lay Statements.**

9          102.    In addition to speaking and consultancy engagements, Defendants' lies have cost

10  Mr. Montañez other major opportunities.  While several prestigious production companies were

11  interested in developing a documentary about Mr. Montañez's life, including Park Slope

12  Productions and Morgan Freeman's Revelations Entertainment, those discussions have all fizzled

13  due to Defendants' disparaging remarks.

14         103.    For example, on or around May 5, 2023, Mr. Montañez was approached by Maddie

15  Hausberg and Alexis Gomez-Garcia at Lightbox about the possibility of producing a documentary

16  about his life.  Lightbox is a media production company based in Los Angeles and London that

17  specializes in high-end documentaries.  It was founded by Simon Chinn (a two-time Academy

18  Award-winning producer – *Man on Wire* and *Searching for Sugar Man*) and Jonathan Chinn (an

19  Emmy Award-winning producer – *LA 92* and *American High*) and has produced popular and

20  critically acclaimed films and series about entertainment figures with complex, emotional stories

21  such as Tina Turner and Whitney Houston.

22         104.    According to Hausberg, Lightbox's ambition was "to delve deep into [Mr.

23  Montañez's] compelling and complex life journey – a Latino's fight up the corporate ladder –

24  exhibiting perseverance, determination, and courage to become a remarkable example of the

25  American Dream.  We are aware that your successes did not come without sacrifice and scrutiny

26  in the media, with judgments and misunderstandings – but we'd like to explore your triumphs and

27  struggles through your own voice, finally setting the record straight."

28         105.    Mr. Montañez was excited about the concept and vision that Lightbox presented for

1  the documentary, so Norma Manzanares at Pivot Media (who was part of Mr. Montañez's team)

2  began engaging in further discussions with Lightbox.  After ensuring Mr. Montañez's existing

3  media/production deals posed no limitation on his ability to pursue this documentary project with

4  Lightbox, on or about July 6, 2023, Manzanares requested that Lightbox prepare a formal

5  agreement.

6      106.    Lightbox responded that it wanted the documentary to present both sides of the

7  controversy surrounding the creation of Flamin' Hot Cheetos, with the ultimate conclusion that

8  Mr. Montañez did, in fact, create them.  Accordingly, while Lightbox was putting together its

9  formal proposal for the documentary project, it also reached out to the LA Times (including Sam

10  Dean) and a "contributor" at PepsiCo/Frito-Lay to secure their participation in the documentary.

11      107.    On or about September 21, 2023, Ms. Gomez-Garcia informed Ms. Manzanares

12  that the contributors at the LA Times and PepsiCo/Frito-Lay wanted the documentary to reach a

13  different conclusion—namely, that Mr. Montañez did not invent Flamin' Hot Cheetos.

14  PepsiCo/Frito-Lay refused to participate in the documentary if the documentary did not further

15  discredit Mr. Montañez as the creator of Flamin' Hot Cheetos.  The statements that they made to

16  Lightbox—including, on information and belief, false statements that Mr. Montañez did not create

17  Flamin' Hot Cheetos—made it impossible for Lightbox to continue with the documentary project

18  in accordance with its initial ambition and creative direction, so Lightbox pulled out of the project.

19      108.    The false statements PepsiCo/Frito-Lay made to Lightbox resulted in the abrupt

20  end to the documentary project, and harmed Mr. Montañez in multiple ways.  First, it caused

21  financial harm, as Mr. Montañez was deprived of a share of revenue from the creation and

22  publishing of the film.  Second, it caused reputational harm, given the false statements made to

23  Lightbox and Ms. Gomez-Garcia claiming that Mr. Montañez was not the creator of Flamin' Hot

24  Cheetos.  Third, it caused reputational harm, by unfairly depriving Mr. Montañez of a platform to

25  tell his story to viewers.

26      109.    These false statements by PepsiCo/Frito-Lay continue the pattern of racially

27  motivated retaliation against Mr. Montañez for having a nontraditional, nonlinear path to success.

28  While Defendants were fine capitalizing on Mr. Montañez's rags-to-riches story for decades, their

1  recent relegation of his life story to an "urban legend," and consistent attempts to undermine him

2  and interfere with his business dealings, leave him no choice but to file suit.

3  <div align="center">**FIRST CAUSE OF ACTION**</div>

4  <div align="center">**Violation of the Fair Employment and Housing Act (Cal. Gov't Code § 12900 *et seq.*)**</div>

5  <div align="center">**(Against PepsiCo and Frito-Lay)**</div>

6  110.   Plaintiff hereby re-alleges and incorporates by reference all allegations in each and

7  every preceding paragraph as if fully set forth herein.

8  111.   The Fair Employment and Housing Act ("FEHA") provides, in pertinent part: "It is

9  an unlawful employment practice . . . [f]or an employer, because of the race, . . . color, . . . , [or]

10  ancestry . . . of any person . . . to discriminate against the person in compensation or in terms,

11  conditions, or privileges of employment." Cal. Gov't Code § 12940.

12  112.   At all times mentioned herein, PepsiCo and Frito-Lay were employers within the

13  meaning of FEHA because they each employed five or more persons.

14  113.   Mr. Montañez was an employee of PepsiCo and/or Frito-Lay. Mr. Montañez was

15  directly employed by Frito-Lay and/or PepsiCo for over 40 years, starting as a janitor in 1976 until

16  2019 when he retired as Vice President of Multicultural Marketing & Sales at PepsiCo.

17  114.   As a Mexican man, Mr. Montañez's protected status under FEHA is his race, color,

18  and ancestry.

19  115.   As alleged herein, PepsiCo and Frito-Lay discriminated against Mr. Montañez

20  because he is Mexican.

21  116.   Defendants took deliberate actions to exclude Mr. Montañez from the R&D process

22  of the product he invented in his own kitchen simply because he was Mexican. Mr. Montañez did

23  not know, and could not have known, as much at the time, given his relative station in the

24  company and the praise he received from others outside R&D. Defendants' recent and

25  unequivocal remarks this past year discrediting Mr. Montañez put him on notice that his treatment

26  at PepsiCo/Frito-Lay was borne of racial discrimination. Indeed, the disparate treatment smacks

27  of discriminatory animus—despite creating countless popular food snacks for Defendants over the

28  years, including the multi-billion dollar Flamin' Hot portfolio, it took them *twenty years* to

1   promote him off the line—far longer than his White counterparts.

2       117.    PepsiCo, Frito-Lay, and their current and former employees have taken actions

3   directly intended to discredit Mr. Montañez as the creator of the incredibly popular Flamin' Hot

4   Cheetos snack that generates hundreds of millions of dollars annually for PepsiCo and Frito-Lay.

5   For decades, PepsiCo and Frito-Lay championed Mr. Montañez as the inventor of Flamin' Hot

6   Cheetos, telling the story of a janitor—the son of a Mexican immigrant—who went on to invent

7   one of the company's most successful products that has been embraced by Hispanic consumers.

8   PepsiCo and Frito-Lay told Mr. Montañez's inspirational story to new and prospective employees

9   during orientations and interviews in order to generate goodwill and benefit from it by improving

10  the morale of employees or increasing their probabilities of hiring applicants for positions within

11  the company.

12      118.    PepsiCo and Frito-Lay likewise capitalized on Mr. Montañez's story of creating

13  Flamin' Hot Cheetos by engaging him to speak publicly and promote PepsiCo and Frito-Lay in

14  order to generate enormous public goodwill and increase their sales and profits.  They held Mr.

15  Montañez out as an example of the American Dream—a humble, low level employee going on to

16  become a senior executive and inventing wildly successful products along the way—to make

17  PepsiCo and Frito-Lay more attractive as employers as well as manufacturers of snack foods and

18  beverages.  This was especially true among Hispanic consumers, for whom Flamin' Hot Cheetos

19  took on even greater cultural significance, and PepsiCo and Frito-Lay cashed in by using Mr.

20  Montañez, a Mexican man, to be the face of the brand.  PepsiCo and Frito-Lay had Mr. Montañez

21  attend promotional and speaking engagements as part of his employment duties, provided Mr.

22  Montañez with means to travel to and from these events (or paid Mr. Montañez's travel costs), and

23  reviewed and approved the speeches that Mr. Montañez gave at those events.

24      119.    Despite decades of publicly accrediting Mr. Montañez with inventing Flamin' Hot

25  Cheetos, PepsiCo and Frito-Lay now seek to tear him down, discredit him, and cast doubt on the

26  veracity of his narrative.  They made damaging statements to the media, including telling the LA

27  Times that Mr. Montañez's invention of Flamin' Hot Cheetos was nothing more than an "urban

28  legend."  While Defendants attempted to walk back this statement shortly thereafter, PepsiCo and

1  Frito-Lay also had an unidentified woman contact DeVon Frankin, the producer of the 2023 movie

2  about Mr. Montañez, *Flamin' Hot*, to uncover additional information about Mr. Montañez and the

3  film so that it could be relayed to PepsiCo, Frito-Lay, Lynne Greenfeld, and, upon information and

4  belief, Sam Dean at the LA Times—all as part of a concerted effort to discredit Mr. Montañez.

5       120.   PepsiCo and Frito-Lay further sabotaged Mr. Montañez's efforts to participate in a

6  lucrative documentary film about his life, telling producers that they would not participate in the

7  film unless it further disseminated their defamatory message—Mr. Montañez is a liar, who did not

8  invent anything.  This further evinces Defendants' discriminatory animus.

9       121.   PepsiCo and Frito-Lay engaged in these activities in an attempt to discredit Mr.

10  Montañez and wrest back the creation story of one of their most successful products, Flamin' Hot

11  Cheetos, away from an uneducated Mexican man with humble roots in a migrant farming labor

12  camp and in favor of more highly educated, MBA-wielding, and White "hotshot snack food

13  professionals" like Lynne Greenfeld.

14       122.   As a direct and proximate cause of PepsiCo and Frito-Lay's conduct, Mr.

15  Montañez suffered damages, including economic losses, reputational harm, and emotional and

16  mental distress.

17       123.   PepsiCo, Frito-Lay, and their past and present employees' open racism and blatant

18  lies and disregard for Mr. Montañez evince they were guilty of oppression, fraud, and malice in

19  connection with their intentional misrepresentations, within the meaning of Civil Code Section

20  3294, as their actions were intended to deprive Mr. Montañez of his property and legal rights.  As

21  such, Mr. Montañez requests an assessment of punitive damages against PepsiCo and Frito-Lay in

22  an amount to be assessed at the time of trial.

23       124.   Mr. Montañez will also seek and is entitled to recover attorneys' fees in connection

24  with this cause of action under Government Code Section 12940, *et seq.*

25       125.   Mr. Montañez timely filed charges against PepsiCo and Frito-Lay with the

26  California Department of Fair Employment and Housing ("DFEH") and has received a Right-to-

27  Sue letter from the DFEH regarding all applicable claims asserted in this action.  Accordingly,

28  Plaintiff has fully exhausted his administrative remedies as to such claims.

2402562.6                          -51-

## SECOND CAUSE OF ACTION

### Fraud—Misrepresentation and False Promise

### (Against All Defendants)

126.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

127.    Flamin' Hot Cheetos has become a cultural phenomenon, and particularly so among the Hispanic community in the United States.  This was, in large part, due to the seasoning inspired by flavors in Mexican street food that Mr. Montañez developed for Flamin' Hot Cheetos and the Hispanic marketing campaign that led to PepsiCo and Frito-Lay to refer to him as "the Godfather of Hispanic Branding."  For decades, PepsiCo and Frito-Lay have not been shy about holding out Mr. Montañez, a Mexican man, as the creator of Flamin' Hot Cheetos in order to engender copious amounts of goodwill among its most passionate consumer base, the Hispanic community, and to ultimately sell more Flamin' Hot Cheetos to the tune of hundreds of millions of dollars annually.  It certainly helped that Mr. Montañez's story also included the fulfillment of the American Dream—namely, the inspirational and meteoric rise of an uneducated Mexican man from humble roots who created a wildly successful product like Flamin' Hot Cheetos and went on to become a senior PepsiCo/Frito-Lay marketing executive.

128.    In order to ensure Mr. Montañez's continuing cooperation (to their direct financial benefit), PepsiCo and Frito-Lay—acting through their executives and employees—promised to continue to support, and to continue to tell the true story of, Mr. Montañez's creation of Flamin' Hot Cheetos.  This promise was conveyed to Mr. Montañez through the statements and actions of PepsiCo, Frito-Lay, and their employees, including presenting Mr. Montañez with a poster celebrating the 40th anniversary of his employment with PepsiCo/Frito-Lay that prominently features the Flamin' Hot Cheetos logo; sending Mr. Montañez to speaking engagements to tell his story about creating Flamin' Hot Cheetos; reviewing and approving Mr. Montañez's speeches that tell the story about creating Flamin' Hot Cheetos; featuring Mr. Montañez's story about creating Flamin' Hot Cheetos in PepsiCo/Frito-Lay new employee orientation materials; telling Mr. Montañez's story about creating Flamin' Hot Cheetos to candidates interviewing for positions at

1   PepsiCo/Frito-Lay; sending notes and letters from PepsiCo/Frito-Lay executives such as Roger

2   Enrico (Chairman and CEO of PepsiCo), Steven Reinemund, Dwight Riskey (VP Marketing

3   Research & New Business of Frito-Lay), and Jim Rich (VP Field Support of Frito-Lay); and

4   featuring Mr. Montañez in PepsiCo/Frito-Lay internal publications.  Based on the senior executive

5   status of the PepsiCo/Frito-Lay employees who promised to support, and did initially appear to

6   support, his creation of Flamin' Hot Cheetos, Mr. Montañez reasonably relied upon their

7   (mis)representations.

8          129.    But, Defendants lied.  Defendants did not continue to support Mr. Montañez's

9   business dealings centered on his creation of Flamin' Hot Cheetos, as they had originally

10  promised.  Instead, they fed false and misleading statements and information to Sam Dean of the

11  LA Times that Mr. Montañez did not invent Flamin' Hot Cheetos and that his story about creating

12  them was an "urban legend," casting doubt about not only the truth of Mr. Montañez's story but

13  also his integrity.  Defendants repeated these false and misleading statements to Lightbox in an

14  attempt to kill a documentary project about Mr. Montañez's creation of Flamin' Hot Cheetos and

15  prevent his story from being told.

16         130.    Defendants had no intention of continuing to support Mr. Montañez's story about

17  his creation of Flamin' Hot Cheetos when they made that promise to Mr. Montañez.  Defendants

18  intended all along that they would use the story of Mr. Montañez's creation of Flamin' Hot

19  Cheetos to drive sales and generate goodwill for PepsiCo/Frito-Lay—particularly among the

20  Hispanic community—but discredit that same story whenever an alternative narrative might

21  become convenient.

22         131.    Defendants intended that Mr. Montañez rely on their misrepresentations and false

23  promises up to and until they discredited Mr. Montañez's creation of Flamin' Hot Cheetos by

24  providing false and misleading statements and information (i) to Dean of the LA Times for

25  publication as part of Dean's May 16, 2021 article, and (ii) to Lightbox in order to silence Mr.

26  Montañez from telling his story about creating Flamin' Hot Cheetos.

27         132.    Mr. Montañez reasonably relied on Defendants' misrepresentations and false

28  promises because senior executives of PepsiCo/Frito-Lay promised to support Mr. Montañez's

story of creating Flamin' Hot Cheetos and because PepsiCo/Frito-Lay appeared to be genuine in their promise by initially encouraging, and providing travel arrangements for, Mr. Montañez to publicly deliver speeches re-telling that story, which were reviewed and approved by PepsiCo and Frito-Lay. Mr. Montañez was not aware that PepsiCo and Frito-Lay had no intention of keeping their promise, and that they would later seek to discredit him. In reasonably relying on Defendants' misrepresentations and false promises, Mr. Montañez staked his personal reputation (by becoming widely recognized as the creator of Flamin' Hot Cheetos among the Hispanic community and consumers at large) and his career (by retiring from PepsiCo/Frito-Lay to pursue speaking and consulting engagements based, in significant part, on his recognition as the creator of Flamin' Hot Cheetos) on the promised continuing support of PepsiCo and Frito-Lay for Mr. Montañez as the creator of Flamin' Hot Cheetos.

133. Defendants' misrepresentations and false promises caused Mr. Montañez to suffer damages, including economic losses, reputational harm, and emotional and mental distress. Mr. Montañez's economic losses include lost income from reduced speaking and consulting engagement opportunities (which he obtained in large part because he was widely recognized as the inventor of the incredibly popular Flamin' Hot Cheetos) and lost income from canceled, or lost opportunities to engage in, film/media projects.

134. Defendants' open racism and blatant lies and disregard for Mr. Montañez evince they were guilty of oppression, fraud, and malice in connection with their intentional misrepresentations and false promises, within the meaning of Civil Code Section 3294, as their actions were intended to deprive Plaintiff of his property and legal rights. As such, Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at the time of trial.

<div align="center">

**THIRD CAUSE OF ACTION**

**Defamation at Common Law and Civil Code § 46**

**(Against All Defendants)**

</div>

135. Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

1    136.    Plaintiff is informed and believes and thereon alleges that, sometime between July

2    and September of 2023, an unidentified PepsiCo and/or Frito-Lay employee spoke or

3    corresponded with Alexis Gomez-Garcia or another employee at Lightbox and expressed, and

4    caused PepsiCo and/or Frito-Lay to express, purportedly factual statements that Mr. Montañez did

5    not invent Flamin' Hot Cheetos.  This statement implied that Mr. Montañez lacked integrity and

6    was taking credit for inventing a product that he knew he did not invent.  Plaintiff is informed and

7    believes and thereon alleges that this PepsiCo and/or Frito-Lay employee intentionally

8    communicated these statements to Lightbox.

9    137.    The statements made to Lightbox regarding Mr. Montañez's not being the inventor

10   of Flamin' Hot Cheetos were false.  Mr. Montañez had developed the Flamin' Hot Cheetos

11   seasoning in his home kitchen, pitched the new snack to Frito-Lay executives, and then conducted

12   the Southern California test markets that proved it to be a success.  PepsiCo and Frito-Lay have

13   credited Mr. Montañez with creating Flamin' Hot Cheetos for over twenty years, including it in

14   their own internal and external marketing and messaging, as well as paying for Mr. Montañez to

15   travel across the country to recount, among other things, the story of his invention of Flamin' Hot

16   Cheetos.  Accounts by former colleagues of Mr. Montañez, including Al Carey (the former CEO

17   of Frito-Lay and Frito-Lay West division), confirm that Mr. Montañez was the one who created

18   Flamin' Hot Cheetos.

19   138.    Defendants made the above-described defamatory statements with actual malice,

20   either with knowledge of their falsity or, alternatively, with a reckless disregard for their falsity.

21   139.    Defendants made these statements without privilege or justification.

22   140.    Defendants' statements concerning Mr. Montañez directly injured him by

23   diminishing his reputation in his profession, trade, and/or business, which consists largely of

24   speaking engagements and film/publishing deals based on the story of his life and achievements,

25   including creating Flamin' Hot Cheetos.  Indeed, the statements to Lightbox came in the midst of

26   a deal for Lightbox to produce a documentary about Mr. Montañez's creation of Flamin' Hot

27   Cheetos.  Accordingly, defendants' statements have a natural tendency to lessen Mr. Montañez's

28   profits.

141.    Defendants' statements convey a defamatory meaning, harming and lowering Mr. Montañez's reputation.

142.    It was Defendants' expectation and intent that the defamatory statements would injure Mr. Montañez economically, including by jeopardizing the documentary deal with Lightbox and otherwise lessening Mr. Montañez's profits.

143.    As a result of the publication of these false and defamatory statements made by Defendants with actual malice, Mr. Montañez's documentary project with Lightbox was terminated.  Mr. Montañez suffered damages including, but not limited to, lost compensation, lost profits, and loss to reputation.

144.    Defendants' open racism and blatant lies and disregard for Mr. Montañez evince they were guilty of oppression, fraud, and malice in connection with their intentional misrepresentations and false promises, within the meaning of Civil Code Section 3294, as their actions were intended to deprive Plaintiff of his property and legal rights.  As such, Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at the time of trial.

<div align="center">

**FOURTH CAUSE OF ACTION**

**Intentional Interference with Prospective Economic Advantage**

**(Against All Defendants)**

</div>

145.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

146.    In May 2023, Lightbox reached out to Mr. Montañez expressing an interest in working with him on a documentary project centered around Mr. Montañez's invention of Flamin' Hot Cheetos.  Both Mr. Montañez and Lightbox were in agreement that they wanted to proceed with developing this documentary project.  Mr. Montañez's team checked their existing media contracts to ensure that there were no applicable limitations on such a documentary project.  By around July 6, 2023, Ms. Norma Manzanares (a member of Mr. Montañez's team) asked Lightbox to put together a formal proposal for this documentary project, including financial compensation and production credit(s) for Mr. Montañez.

1    147.    Between July 6 and September 21, 2023, Lightbox reached out to Defendants to see
2    whether PepsiCo and Frito-Lay were interested in participating in the documentary.  Plaintiff is
3    informed and believes and thereon alleges that, as part of these discussions, Lightbox informed
4    Defendants of Mr. Montañez's involvement in the documentary project, and that Defendants
5    therefore had actual knowledge of Mr. Montañez's pre-existing economic relationship with
6    Lightbox.

7    148.    Lightbox further informed Defendants that the documentary would ultimately
8    conclude that Mr. Montañez invented Flamin' Hot Cheetos.  Plaintiff is informed and believes and
9    thereon alleges that Defendants stated to Lightbox that Mr. Montañez did not invent Flamin' Hot
10   Cheetos.  The statements made to Lightbox regarding Mr. Montañez's not being the inventor of
11   Flamin' Hot Cheetos were false.  Mr. Montañez had developed the Flamin' Hot Cheetos seasoning
12   in his home kitchen, pitched the new snack to Frito-Lay executives, and then conducted the
13   Southern California test markets that proved it to be a success.  PepsiCo and Frito-Lay have
14   credited Mr. Montañez with creating Flamin' Hot Cheetos for over twenty years, including it in
15   their own internal and external marketing and messaging, as well as paying for Mr. Montañez to
16   travel across the country to recount, among other things, the story of his invention of Flamin' Hot
17   Cheetos.  Accounts by former colleagues of Mr. Montañez, including Al Carey (the former CEO
18   of Frito-Lay and Frito-Lay West division), confirm that Mr. Montañez was the one who created
19   Flamin' Hot Cheetos.

20   149.    In addition, Defendants conditioned their participation in the documentary on
21   Lightbox's acquiescence into portraying Defendants' false narrative regarding Mr. Montañez's
22   status as the creator in Flamin' Hot Cheetos.

23   150.    Defendants intentionally made these false statements about Mr. Montañez to
24   Lightbox.  Plaintiff is informed and believes and thereon alleges that Defendants' false statement
25   was designed to disrupt the existing economic relationship between Mr. Montañez and Lightbox
26   by putting the documentary project in jeopardy.

27   151.    Shortly thereafter, Lightbox canceled the documentary project.  Defendants
28   succeeded in their scheme to disrupt the existing economic relationship between Mr. Montañez

2402562.6                                      -57-
                                            COMPLAINT

1 | and Lightbox.

2 |  152.  Defendants' intentional false statements to Lightbox caused Mr. Montañez to suffer

3 | damages, including economic losses, reputational harm, and emotional and mental distress.

4 |  153.  Defendants' open racism and blatant lies and disregard for Mr. Montañez evince

5 | they were guilty of oppression, fraud, and malice in connection with their intentional

6 | misrepresentations and false promises, within the meaning of Civil Code Section 3294, as their

7 | actions were intended to deprive Plaintiff of his property and legal rights. As such, Plaintiff

8 | requests an assessment of punitive damages against Defendants in an amount to be assessed at the

9 | time of trial.

10 | **FIFTH CAUSE OF ACTION**

11 | **Unjust Enrichment**

12 | **(Against All Defendants)**

13 |  154.  Plaintiff hereby re-alleges and incorporates by reference all allegations in each and

14 | every preceding paragraph as if fully set forth herein.

15 |  155.  PepsiCo and Frito-Lay obtained enormous benefits from advertising Mr.

16 | Montañez's story regarding his creation of Flamin' Hot Cheetos. Flamin' Hot Cheetos has

17 | become a cultural phenomenon, and particularly so among the Hispanic community in the United

18 | States. This was, in large part, due to the seasoning inspired by flavors in Mexican street food that

19 | Mr. Montañez developed for Flamin' Hot Cheetos and the Hispanic marketing campaign that led

20 | to PepsiCo and Frito-Lay to refer to him as "the Godfather of Hispanic Branding." For decades,

21 | PepsiCo and Frito-Lay have not been shy about holding out Mr. Montañez, a Mexican man, as the

22 | creator of Flamin' Hot Cheetos in order to engender copious amounts of goodwill among its most

23 | passionate consumer base, the Hispanic community, and to ultimately sell more Flamin' Hot

24 | Cheetos to the tune of hundreds of millions of dollars annually. It certainly helped that Mr.

25 | Montañez's story also included the fulfillment of the American Dream—namely, the inspirational

26 | and meteoric rise of an uneducated Mexican man from humble roots who created a wildly

27 | successful product like Flamin' Hot Cheetos and went on to become a senior PepsiCo/Frito-Lay

28 | marketing executive.

156.    For many years, PepsiCo and Frito-Lay credited Mr. Montañez with the creation of Flamin' Hot Cheetos, including having Mr. Montañez conduct many speaking engagements over the years to tell his story, paying for his travel expenses, reviewing and approving his speeches about his creation of Flamin' Hot Cheetos, telling his story to candidates during job interviews, including his story as part of new-hire orientation materials, and recognizing him as the creator of Flamin' Hot Cheetos both inside and outside their organizations.

157.    However, Defendants abruptly changed course and began publicly discrediting Mr. Montañez's creation of Flamin' Hot Cheetos.  They fed false and misleading statements and information to Sam Dean of the LA Times that Mr. Montañez did not invent Flamin' Hot Cheetos and that his story about creating them was an "urban legend," falsely casting doubt about not only the truth of Mr. Montañez's story but also his integrity.  Defendants repeated these false and misleading statements to Lightbox in an attempt to kill a documentary project about Mr. Montañez's creation of Flamin' Hot Cheetos and prevent his story from being told.

158.    Defendants' false and misleading statements caused Mr. Montañez to suffer damages, including economic losses, reputational harm, and emotional and mental distress.  Mr. Montañez's economic losses include lost income from reduced speaking and consulting engagement opportunities (which he obtained in large part because he was widely recognized as the inventor of the incredibly popular Flamin' Hot Cheetos) and lost income from canceled, or lost opportunities to engage in, film/media projects.

159.    Under these circumstances, PepsiCo and Frito-Lay's retention of the benefits from Mr. Montañez's story at his expense is unjust.  PepsiCo and Frito-Lay should not be allowed to build Mr. Montañez up for decades as the creator of Flamin' Hot Cheetos, only to then tear him down, all the while reaping the profits at Mr. Montañez's expense.

## SIXTH CAUSE OF ACTION

**Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*)**

**(Against All Defendants)**

160.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

1    161.    California's Unfair Competition Law, codified at Business and Professions Code

2    Section 17200 *et seq.*, prohibits "any unlawful, unfair or fraudulent business act or practice." Cal.

3    Bus. & Prof. Code § 17200.  Defendants have violated this statute under all three prongs.

4    162.    First, Defendants have engaged in unlawful business practices by discriminating

5    against Mr. Montañez in violation of FEHA, defaming Mr. Montañez as being untruthful and

6    lacking integrity regarding his creation of Flamin' Hot Cheetos, defrauding Mr. Montañez by

7    making misrepresentations and false promises about recognizing him as the inventor of Flamin'

8    Hot Cheetos, interfering with a documentary project that Mr. Montañez and Lightbox were

9    actively pursuing, and unjustly enriching itself by advertising Mr. Montañez's story only to

10   discredit it later at Mr. Montañez's expense.

11   163.    Second, Defendants have engaged in unfair business practices by first propping up

12   Mr. Montañez as the creator of Flamin' Hot Cheetos for decades and then abruptly discrediting

13   him later.  Defendants deceived the public as to their recognition of Mr. Montañez—a Mexican

14   man from humble origins who advanced to the senior executive level at PepsiCo—as the inventor

15   of Flamin' Hot Cheetos.  Their longtime support for Mr. Montañez's story helped build up a

16   fervent consumer base, especially among Hispanic consumers, who were deceived into believing

17   that PepsiCo and Frito-Lay stood by Mr. Montañez and afforded Defendants additional goodwill

18   as a result.  Defendants' sudden discreditation of Mr. Montañez after years of supporting his story

19   has harmed consumers and Mr. Montañez.

20   164.    Defendants also engaged in unfair business practices by using Mr. Montañez's

21   story to unfairly attract and retain new employees.  PepsiCo and Frito-Lay told Mr. Montañez's

22   story to job candidates and to new hires despite having no intention of maintaining their support

23   for Mr. Montañez, all to unfairly improve their prospects of hiring and retaining employees.

24   165.    Third, Defendants have engaged in fraudulent business practices by utilizing Mr.

25   Montañez's story about the creation of Flamin' Hot Cheetos to derive additional public goodwill,

26   as well as sales and profits, when they had no intention of maintaining support for Mr. Montañez,

27   thereby deceiving consumers.

28   166.    Defendants' unlawful, unfair, and fraudulent business practices caused Plaintiff

1   harm and injury. Defendants were unjustly enriched at Plaintiff's expense. Plaintiff is entitled to

2   restitution of any profits Defendants incurred as a result of the use of Mr. Montañez's story.

3       167.    Plaintiff also seeks an injunction prohibiting PepsiCo, Frito-Lay, and their

4   employees from making false and misleading statements that Mr. Montañez is not the creator of

5   Flamin' Hot Cheetos.

6   <div align="center">**PRAYER FOR RELIEF**</div>

7       WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

8       1.    For judgment in favor of Plaintiff and against Defendants on all claims asserted in

9   this Complaint;

10       2.    For damages according to proof at trial, including interest;

11       3.    For an order preliminarily enjoining Defendants, their agents and representatives,

12   and all persons in concert or participating with them from issuing any statements that express or

13   imply that Mr. Montañez is not the creator of Flamin' Hot Cheetos;

14       4.    For nominal damages, to the extent the Court determines that Plaintiff has not

15   established actual damages;

16       5.    For all costs, including reasonable attorneys' fees and expenses, incurred by

17   Plaintiff;

18       6.    For restitution, including restitutionary disgorgement of profits Defendants incurred

19   as a result of their use of Mr. Montañez's story;

20       7.    For an award of punitive damages in accordance with Cal. Civ. Code § 3294;

21       8.    For prejudgment interest; and

22       9.    For any other relief the Court deems just and proper.

23

24   <div align="center">**DEMAND FOR JURY TRIAL**</div>

25       Plaintiff demands a trial by jury for all of the claims asserted in this Complaint that are so

26   triable.

27

28

DATED:  July 18, 2024

ELLIS GEORGE LLP
Eric M. George
Serli Polatoglu
David D. Kim

By: _____
ERIC M. GEORGE
Attorneys for Plaintiff Richard Montañez

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| ELLIS GEORGE LLP; Eric M. George, Esq. (SBN 166403); Serli Polatoglu (SBN 311023)<br>2121 Avenue of the Stars, 30th Floor<br>Los Angeles, CA 90067<br>TELEPHONE NO.: (310) 274-7100     FAX NO.: (310) 275-5697<br>EMAIL ADDRESS: egeorge@ellisgeorge.com; spolatoglu@ellisgeorge.com<br>ATTORNEY FOR *(Name):* Plaintiff, Richard Montañez | **Electronically Filed<br>Superior Court of California<br>County of San Bernardino<br>Rancho Cucamonga District<br>7/18/2024 5:49 PM<br>By: Kayla Schuebel, DEPUTY** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **SAN BERNARDINO**
 STREET ADDRESS: 8303 Haven Avenue
 MAILING ADDRESS: same as above
 CITY AND ZIP CODE: Rancho Cucamonga, CA 91730
 BRANCH NAME: Civil Division, Rancho Cucamonga District

CASE NAME: RICHARD MONTAÑEZ vs PEPSICO, INC, ET AL.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: CIVRS2400356 |
|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $35,000)　☐ Limited (Amount demanded is $35,000 or less) | ☐ Counter　☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☒ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition *(not specified above)* (43)

2. This case ☐ is　☒ is not　complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☒ punitive
4. Number of causes of action *(specify):* 6
5. This case ☐ is　☒ is not　a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: July 18, 2024

Eric M. George
_____
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only. **Page 1 of 2**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO

CIVRS2400356

RICHARD MONTAÑEZ

Case No.: _____

vs.

### CERTIFICATE OF ASSIGNMENT

PEPSICO, INC., FRITO-LAY, INC., ET AL.

A civil action or proceeding presented for filing must be accompanied by this Certificate. If the ground is the residence of a party, name and residence shall be stated.

The undersigned declares that the above-entitled matter is filed for proceedings in the Civil Division, Rancho Cucamonga District of the Superior Court under Rule131 and General Order of this court for the checked reason:

■ General          ☐ Collection

| | **Nature of Action** | **Ground** |
|---|---|---|
| ☐ | 1. Adoption | Petitioner resides within the district. |
| ☐ | 2. Conservator | Petitioner or conservatee resides within the district. |
| ☐ | 3. Contract | Performance in the district is expressly provided for. |
| ☐ | 4. Equity | The cause of action arose within the district. |
| ☐ | 5. Eminent Domain | The property is located within the district. |
| ☐ | 6. Family Law | Plaintiff, defendant, petitioner or respondent resides within the district. |
| ☐ | 7. Guardianship | Petitioner or ward resides within the district or has property within the district. |
| ☐ | 8. Harassment | Plaintiff, defendant, petitioner or respondent resides within the district. |
| ☐ | 9. Mandate | The defendant functions wholly within the district. |
| ☐ | 10. Name Change | The petitioner resides within the district. |
| ☐ | 11. Personal Injury | The injury occurred within the district. |
| ☐ | 12. Personal Property | The property is located within the district. |
| ☐ | 13. Probate | Decedent resided or resides within or had property within the district. |
| ☐ | 14. Prohibition | The defendant functions wholly within the district. |
| ☐ | 15. Review | The defendant functions wholly within the district. |
| ☐ | 16. Title to Real Property | The property is located within the district. |
| ☐ | 17. Transferred Action | The lower court is located within the district. |
| ☐ | 18. Unlawful Detainer | The property is located within the district. |
| ☐ | 19. Domestic Violence | The petitioner, defendant, plaintiff or respondent resides within the district. |
| ☐ | 20. Other _____ | |
| x | 21. THIS FILING WOULD | NORMALLY FALL WITHIN JURISDICTION OF SUPERIOR COURT |

The address of the accident, performance, party, detention, place of business, or other factor which qualifies this case for filing in the above-designed district is:

Defendants' facility where Plaintiff was employed and incidents occurred     9535 Archibald Avenue
NAME – INDICATE TITLE OR OTHER QUALIFYING FACTOR                               ADDRESS

Rancho Cucamonga                          CA                  91730
CITY                                      STATE               ZIP CODE

I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration was executed on   July 18, 2024   at   Los Angeles, CA   , California.

_____
Signature of Attorney/Party

Form # 13-16503-360          CERTIFICATE OF ASSIGNMENT          Rev. June 2019
Mandatory Use